**John B. TRENTHAM, Jr., Plaintiff,**

**v.**

**K–MART CORPORATION, Defendant.**

**No. CIV–3–89–0641 (Jury).**

United States District Court,
E.D. Tennessee, N.D.

April 26, 1991.

David A. Burkhalter, II, and Perry H. Windle, III, Knoxville, Tenn., for plaintiff.

John B. Rayson, and Thomas M. Hale, Kramer, Rayson, McVeigh, Leake & Rodgers, Knoxville, Tenn., for defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a civil action brought against the plaintiff's former employer for alleged age

discrimination, defamation, and retaliatory discharge. The plaintiff had been employed for several years as the loss prevention manager of a K–Mart Corporation ("K–Mart") store on Clinton Highway in Knoxville, Tennessee when he was discharged from his employment on April 11, 1989, when he was 41 years old. The plaintiff contends that he was discharged because of his age, and that K–Mart "has engaged in a pattern and practice of discriminating against older, long-term employees." [See Pretrial Order, doc. 7.]

The plaintiff also says that he suffered a collapse due to a cardiac condition on September 2, 1988, while he was at work. He says that he experienced much difficulty in obtaining payment of his hospital and medical expenses under the health insurance coverage obtained through his employment by K–Mart, and that, as a result of this difficulty, he threatened to sue K–Mart under the Tennessee Workers' Compensation Law. He says that K–Mart discharged him from employment because of his threat to pursue his remedies under the Workers Compensation Law, and that K–Mart engages in a pattern and practice of retaliation against employees who have filed workers compensation claims.

The plaintiff also contended when he commenced this lawsuit that, after his discharge from employment, K–Mart, through its agents and employees, defamed the plaintiff by stating that he had been a dishonest employee, that he had been caught taking company merchandise without permission, and that he had been discharged from employment by K–Mart for these reasons. However, when the Court heard oral argument on the defendant's motion for summary judgment [doc. 14] on March 8, 1991, counsel for the plaintiff conceded that the plaintiff does not have a cause of action for defamation in this case, as he had conceded in his brief in opposition to the motion [doc. 19].

This Court has jurisdiction of the plaintiff's claim under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq., under 28 U.S.C. § 1331. Regardless of the existence of pendent or ancillary jurisdiction, the Court has jurisdiction of the plaintiff's claims under the Tennessee Human Rights Act, Tennessee Code Annotated §§ 4–21–101, et seq., and for retaliatory discharge, under 28 U.S.C. § 1332. Regarding the plaintiff's claim under federal law, as well as his age discrimination claim under the Tennessee Human Rights Act, it is not disputed that the plaintiff was within the protected age group when he was discharged from employment on April 11, 1989. K–Mart does not dispute that the plaintiff complied with the applicable administrative procedure within the statutory time limits for the prosecution of his claim under the Age Discrimination in Employment Act.

The diverse citizenship of the parties is admitted. It is apparent that Tennessee law governs the plaintiff's claim of retaliatory discharge, since he was employed by K–Mart to work in Tennessee at all pertinent times, and all of the allegedly tortious conduct complained of occurred, if at all, in Tennessee. "[A] federal court in a diversity case applies the law of the state in which it sits, including that state's choice of law provisions." Davis v. Sears, Roebuck and Company, 873 F.2d 888, 892 (6th Cir.1989) (citation omitted). Tennessee law would apply to this action under either a lex loci delicti or a dominant contacts choice-of-law rule. See Winters v. Maxey, 481 S.W.2d 755 (Tenn.1972).

The defendant K–Mart Corporation has moved under Fed.R.Civ.P. 56 for a summary judgment of dismissal of all of the plaintiff's claims in this civil action. [Doc. 14.] The parties have submitted in support of and in opposition to this motion transcripts of various discovery depositions, and other evidentiary material, including affidavits. The following is a summary of the pertinent deposition testimony.

The plaintiff, Mr. Trentham, testified that before he was discharged from employment, in 1983 or 1984, he was injured in a motor vehicle accident while collecting payment on a bad check for K–Mart. The automobile liability insurance carrier for the other driver involved in this accident settled Mr. Trentham's claim arising out of

this accident. He asked Kentha Farmer, the personnel manager at K–Mart's Clinton Highway store, whether he should file a workers compensation claim as a result of this accident, and, he says, she advised him against it, saying that the fact that he had filed such a claim would go in his personnel file, and that K–Mart frowned upon workers compensation claims. Mr. Trentham's group medical insurance and disability insurance obtained through his employment by K–Mart did pay benefits to him as a result of this motor vehicle accident.

Concerning the incident on September 2, 1988, when he suffered an attack of some nature at the K–Mart store where he worked, Mr. Trentham testified that he had come to the store after appearing in court for K–Mart, one of his duties as the store loss prevention manager. He testified that he experienced numbness, chest pain, and blurred vision, and felt faint, and that some other employees applied ice to his face and neck. He felt better after 20 minutes, ignored his fellow employees' advice to be examined by a physician, and drove home. He suffered a similar attack later, and so sought medical attention the next day.

Mr. Trentham's physicians diagnosed his problem as a collapsed artery, and treated it. He testified that he has not experienced a similar attack since this treatment. The physician whom he first consulted was not a "company doctor," but was instead his family physician. K–Mart had nothing to do with the selection of Mr. Trentham's physicians. Following the initial treatment, Mr. Trentham had to be hospitalized again, for the treatment of phlebitis which apparently was related to the earlier medical treatment he had received.

Mr. Trentham, after he got out of the hospital, came to the K–Mart store to meet with Ms. Farmer, the personnel manager, to sign the papers required to obtain insurance benefits as a result of his attack and subsequent treatment. He applied for both disability insurance benefits and medical insurance benefits, and, he testified, he asked whether he should file an application for workers compensation benefits. According to Mr. Trentham, Ms. Farmer

"again said that I wouldn't advise you to turn in a Workmen's Comp claim on this. Said your Aetna [disability insurance] will take care of half your check. Blue Cross [medical insurance] will pay the medical bills, hospital bills."

On the claim form submitted to the disability insurer, on the line on which is written "IS ILLNESS OR INJURY DUE TO OCCUPATIONAL CAUSES," Ms. Farmer did not check either yes or no. She testified that this was an oversight on her part. On the same form, Mr. Trentham's attending physician stated his diagnosis of a collapsed artery, and in response to the question "IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT," the physician answered no.

Mr. Trentham experienced difficulties in obtaining payment of his insurance benefits. He received dunning letters from his health care providers, including a letter from the hospital threatening him with a hospital lien. This angered him, so he complained to Sam Taylor, the manager of the K–Mart store at which he worked, and "told [Mr. Taylor] that if [he, Mr. Trentham] had to, [he] would file a lawsuit against K–Mart because Workmen's Comp, Blue Cross, nobody was paying the bills." According to Mr. Trentham, Mr. Taylor stated that he was experiencing similar problems, and suggested that Mr. Trentham consult with Ms. Farmer, the personnel manager.

In January, 1989, Mr. Trentham was still experiencing these difficulties, and he complained to Morris Lee Pence, K–Mart's loss prevention district manager for the district including the store at which Mr. Trentham worked. Ms. Farmer, the personnel manager, had told Mr. Pence that Mr. Trentham had said that he was going to sue because of his difficulties in obtaining insurance benefits. She did not know who it was that Mr. Trentham was threatening to sue. Mr. Trentham testified that Mr. Pence approached him, and asked Mr. Trentham "what's this you're going to sue K–Mart," to which Mr. Trentham responded, "I said I don't think that I should pay

the bills. It happened while I was on the job. And he said—And I told him I was going to file a claim on Workmen's Comp, and he said hold off about that, and he said I'll even call Blue Cross and see if we can straighten it out."

Some time after discussing this matter twice with Mr. Taylor and once with Mr. Pence, Mr. Trentham finally did obtain payment of his outstanding medical and hospital bills. Ms. Farmer, the personnel manager, testified that, to her knowledge, no one employed by K–Mart had control over the payment of claims under the Blue Cross/Blue Shield medical insurance policy. Mr. Trentham admitted at his deposition that he has no knowledge that any employee of K–Mart had anything to do with deciding whether and when to pay his medical and hospital bills.

Mr. Trentham testified that after these conversations in which he threatened to sue K–Mart to recover workers compensation benefits, Mr. Taylor's and Mr. Pence's attitudes towards him changed. He testified that, for example, when he asked Mr. Taylor for instructions, Mr. Taylor answered curtly that he, Mr. Trentham, was the loss prevention manager. Once, when a shoplifter caught by Mr. Trentham accused Mr. Trentham of taking a bribe, Mr. Taylor, without talking to Mr. Trentham about this accusation, called Mr. Hunt, a K–Mart employee who at the time had supervisory authority over loss prevention employees, to interview Mr. Trentham. After a heated exchange between Mr. Trentham and Mr. Hunt, Mr. Hunt consulted another K–Mart employee who had witnessed Mr. Trentham's interrogation of the shoplifter, and, upon learning that the shoplifter's accusation was groundless, dropped the matter.

During their heated discussion, Mr. Hunt criticized Mr. Trentham's performance of his duties regarding paperwork. Mr. Trentham described this portion of the exchange as follows:

I tried to tell him that I had been doing the paperwork, and he said that if you don't get on the ball and start doing your paperwork, said they're going to—said in the future they're going to start hiring

guys with college degrees that don't care to do audits and what have you. And we had a few more words exchanged. And his final statement was you might not be here six months from now. And I said that's fine with me. I said let's go talk to Mr. Taylor. If he thinks I'm not doing my job, I'll go now. He said sit down. Said you don't need to get your blood up and your heart and all that.

Concerning Mr. Pence and his allegedly changed attitude towards Mr. Trentham, the latter testified that this became apparent when Mr. Pence instructed Mr. Trentham to remodel a room used for interrogating shoplifters. Always before, according to Mr. Trentham, Mr. Pence had instructed him not to perform menial labor, because of his status as the loss prevention manager.

Mr. Trentham testified that he and Mr. Pence had a conversation in January, 1989 which indicated, in the light of subsequent events, age discrimination. This portion of Mr. Trentham's testimony is as follows:

When [Mr. Pence] come back in January, he took me to the grill and says how old are you. And I said I'll be forty-two in May, that was four or five months down the road. And he said you're getting too ... old to chase [shoplifters]. He said let's put you in home improvement. I said, Mr. Pence, I've been in this 14 years. When I get burned out, get tired of security, I'll give you a notice, and I'll leave K–Mart.

In his charge of discrimination filed with the Tennessee Human Rights Commission and with the Equal Employment Opportunity Commission ("EEOC"), Mr. Trentham stated that Mr. Pence said, "Well John, let's both face it, you have been in this for fourteen years, nine at K–Mart and it looks like you're getting burned out. They are going to be replacing security personnel with younger guys with college educations that don't mind doing paper work and audits."

Mr. Trentham also testified that Mr. Pence made comments concerning Mr. Trentham's assistant in loss prevention, Phyllis Breeden, which indicate age dis-

crimination. Ms. Breeden is older than Mr. Trentham. Mr. Trentham testified that Mr. Pence once asked him "is she any good, and I said, well, she's not caught too many shoplifters. He said, well, I understand she don't even have a high school education, she stutters. Said she don't dress proper. Said let's transfer her." Mr. Trentham testified that Mr. Pence also said of Ms. Breeden, "she's forty-four, said we need to get some young gung-ho people in."

However, Mr. Trentham admitted that he had complained to Mr. Taylor and to Mr. Pence about Ms. Breeden's work on several occasions. The conversation with Mr. Pence in which Mr. Pence is alleged to have referred to Ms. Breeden's age occurred in November, 1988, before Mr. Trentham threatened to sue K–Mart in frustration over his insurance problems. It is uncontroverted that, after K–Mart discharged Mr. Trentham from employment, Ms. Breeden was promoted to the position of loss prevention manager at the Clinton Highway store. Mr. Trentham conceded at his deposition, on the basis of this fact, that his allegation that he was replaced by a younger person was not true.

It is necessary to recount in detail Mr. Trentham's testimony concerning the action for which K–Mart discharged him from employment, or which, according to Mr. Trentham's view, supplied the pretext for discharging him from employment. One of Mr. Trentham's duties as the loss prevention manager was to assist the store employee referred to as the "605 person" in the destruction of merchandise which was not to be sold. The numerals 605 refer to a computer code for such merchandise. The 605 person was responsible for taking custody of returned or damaged merchandise, and obtaining credit for such merchandise from the suppliers of it. In any case in which a supplier gave K–Mart credit for such merchandise, but did not require that it be sent by K–Mart back to the supplier, the 605 person ordered that it be destroyed or defaced and discarded, so that no one could retrieve it from a dumpster and present it to K–Mart again for a refund or replacement.

Shortly before the incident which led to K–Mart's discharge of Mr. Trentham from employment, there was a change in K–Mart's computer code, which classified merchandise of this nature to be destroyed or discarded under the numerals 620 instead of 605. This difference does not appear to be significant in this case. There was also a change in K–Mart's practice which had the effect of putting certain merchandise, such as infant automobile seats, under the control of a separate apparel division, so that the 605 or 620 person had no responsibility or authority with respect to the destruction or discarding of returned merchandise of this nature. For a reason which will appear, this change in procedure became very significant in this case.

The practice at K–Mart's Clinton Highway store had been for Mr. Trentham to be the one who physically destroyed the merchandise or defaced it before discarding it in a dumpster, because the 605 or 620 person at the store did not have the physical strength to do this. On this particular occasion, according to Mr. Trentham, the following occurred:

> I was working on that office back there, had a desk pulled out. If I'm not mistaken, it was a Thursday. They had a truck of merchandise, there was merchandise all over the place, you couldn't even walk. I was having to climb over the table to get into the room to work on it. And Gary Simmons, the receiving manager, come over there and telling me said, John, there's a flat here. There was a big box, had two baby seats in it, and another box had two in it. He said are you going to destroy these? He said are these damaged? I said I don't know, let's check. Wilma come down walking through, she's the 605 lady, the one that's taking care of the merchandise, damaged merchandise. And I hollered at her, and I asked her if it was damaged merchandise to be destroyed. She said if it's at the door, if it's in the trash, it's to be destroyed. So, me and Gary pulled the baby seats out of the boxes and looked, and they were damaged....

Well, we determined they were damaged. Then Gary pushed the flat out on the dock, and I went out, was going to throw them in the dumpster, tear them up and throw them in the dumpster. The dumpster was full. And he said, well, they can't sit out here, and I said, well, I'll haul them to the City dump. So they set out on the dock. I went ahead. I was working on the room in there and later got my truck and took it around, loaded them up, and I forgot the City dump closes at four or 4:30. So, I had them in the back of my truck, and I looked at them and was thinking about selling them at a yard sale, even though, if they weren't that damaged. But I decided they was too damaged to sell like that anyway. So, the next morning, I put three or four bags of trash in the back of my truck and went to the City dump.

However, the apparel division had not decided that these seats were to be destroyed or discarded; instead, they were to be marked down, and put back on shelves for sale. According to Wilma Cason, the 605 employee, the infant automobile seats removed by the plaintiff had not, before they had passed from under her control to the control of the apparel division, been cleared for destruction in the 605 system.

When the employee in the apparel division who was responsible for the infant automobile seats discovered that they had been taken away, she told Mr. Taylor, the store manager. Mr. Taylor then approached Mr. Trentham about the missing merchandise, and, according to Mr. Trentham, the conversation went as follows:

A week later, Mr. Taylor comes in my office, shut the door, and he said you want to tell me about the baby seats and the baby clothes. And I said, now, Mr. Taylor, there was no baby clothes in with those boxes. I said have you talked to Gary and Wilma? At that time he said, no, he hadn't talked to them. So, I don't know if he went then and talked to Gary and asked him if there was any baby clothes, if they was damaged or what. But I stopped Mr. Taylor a few minutes later, and I said I didn't tell you that I hauled them off because you said baby clothes. And I said I wanted to make sure that Gary had talked to you and told you there was no baby clothes. And he said, well, just don't haul off anything else period, you know.

Several days later, Mr. Taylor called Mr. Trentham to a meeting with him and Mr. Pence. Mr. Trentham recorded this meeting without the knowledge of Mr. Taylor or Mr. Pence, and the transcript of this recording is among the materials submitted in support of the defendant's motion for summary judgment. When asked by Mr. Pence how he came to violate company policy by removing this merchandise from the store, Mr. Trentham responded,

Well, all I can say is I was back there working on that room. It was all piled up and everything. It was sitting there at the trash. I stopped Wilma and asked her if it was damaged stuff to be thrown out, destroyed. She said yeah, as far as she knew, that she didn't do apparel stuff. Gary pulled some of them up and looked and they was damaged. He said, "Let's get them out of the way. Get them out of here." We pushed it outside. Lamar was out there putting lawn mowers together. It was about 4:41 something like that. And I come back around, I told him just before closing, I said, "I can't get them in the dumpster. I will haul them off."

Mr. Trentham admitted to Mr. Taylor and Mr. Pence that, at first, he intended to sell this merchandise at a yard sale, but then he discovered that it was not in good enough condition to sell.

On April 10, 1989, Mr. Trentham made a written statement concerning this incident which occurred on February 23, 1989. He wrote in part,

I saw a flat with 3 car seats (damaged) and 1 blue back carrier, sitting in front of the compactor.

I asked the 605 lady, Wilma, if the car seats were to be destroyed, and she said she didn't destroy apparrell's (sic) merchandise, but if they were sitting there

on a flat, she was sure they were ready to be destroyed.

\* \* \* \* \* \*

I did not know until over a week later, that the car seats were not written off. I did not sneak anything out the door, I did not steal any merchandise.

I realize I should have destroyed the merchandise. After talking to my manager, telling him I hauled the seats off, he said not to haul off anything, no matter what, destroy the stuff as per company policy.

Mr. Trentham conceded in his deposition that he knew of the K–Mart policy which required that damaged merchandise be destroyed or discarded, and not sold or given to employees. He testified, however, that this policy was not always followed:

It was in the handbook, according to company rules you don't take damaged merchandise or what have you, don't sell it. But like I say I had done it several times over the years. Mr. Taylor had even walked to the door with me with damaged merchandise. And I didn't think I was violating the policy that much. It never was right to the tee anyway.

Mr. Trentham also testified that he was not aware of a requirement that he have management approval in order to carry away damaged merchandise to be destroyed or discarded, because "I had went to Mr. Taylor before when I was called to destroy merchandise, and he would say you're the security manager. You don't need to get my permission."

There is some dispute in this record about where the cart on which the infant automobile seats had been placed was sitting when Mr. Trentham took them. Mr. Trentham testified that the cart was sitting near a large locked door where merchandise to be destroyed or defaced and discarded, and other trash, were placed regularly. The Court must, of course, in deciding this motion for summary judgment, resolve all disputes in favor of the opponent of the motion, Mr. Trentham, and draw from the evidence all inferences which may reasonably be drawn in his favor. The Court must find, based upon the evidence reviewed so far in this Memorandum Opinion, that Mr. Trentham believed in good faith that the infant automobile seats had been placed on the cart for the purpose of being destroyed or defaced and discarded. The Court must also find that Mr. Trentham was unaware of the recent change in K–Mart policy which removed the authority of the 605/620 person to destroy or discard merchandise stocked and sold by the apparel division.

Regarding K–Mart's allegedly disparate treatment of him because of his age, Mr. Trentham testified that he knew of a case in which an unnamed assistant manager had a K–Mart mechanic destroy his automobile for the purpose of committing insurance fraud, "[a]nd it so happened that his daddy was a security director in the North Carolina district. Pence comes in, and me and Mr. Taylor, and he says if you open your mouth, you will lose your job. They didn't fire him. They didn't prosecute him." Mr. Trentham testified that the mechanic was transferred to California, and that he does not know where the assistant manager went.

Mr. Trentham has also submitted affidavit evidence of the allegedly disparate treatment of two younger K–Mart employees not in the protected age group. In the case of one who was caught using cocaine and stealing several hundred dollars in cash, Mr. Trentham says that Mr. Taylor did not fire him, but allowed him to pay back the stolen money, after which this employee was transferred to another store. Mr. Trentham stated that both Mr. Taylor and Mr. Pence told him to keep quiet about this incident.

In another case, according to Mr. Trentham, a manager-in-training at the Clinton Highway store "was implicated in several cash shortages involving several hundred dollars. Taylor and Pence were aware of [this employee's] involvement in the cash shortages. He was not fired, but he was transferred to the Broadway store."

This somewhat vague evidence of disparate treatment submitted by Mr. Trentham

is countered specifically and completely in Mr. Taylor's February 28, 1991 affidavit [doc. 25]. Mr. Taylor states in this affidavit that one assistant manager, Bruce Robert Pearce, was indeed caught misappropriating company funds, but only after he had been transferred from the Clinton Highway store to a K–Mart store in Morristown, Tennessee.

> Contrary to the Affidavit of John Trentham dated January 25, 1991, Pearce was not caught or suspected of taking cash or property from the Clinton Highway K mart in 1987 or at any other time. ... [W]hen Pearce was employed at the Clinton Highway store, I never had disciplinary problems of any kind with him. My experience with Pearce while he was at the Clinton Highway store was good.... There was some suspicion that Pearce was involved with drugs, but I never saw any evidence of drug use while he was on company time.

K–Mart discharged Mr. Pearce from employment after he misappropriated funds at the store in Morristown.

As for the other assistant manager, Robert Craig Maffeo, he worked at the Clinton Highway store from April 12, 1984 until March 14, 1985. "While Maffeo was employed at the Clinton Highway store, he was never caught or suspected of taking cash from the company. If anyone caught or suspected Maffeo of taking cash from the Clinton Highway store, including Trentham, it was never reported to me." K–Mart discharged Mr. Maffeo from employment for misappropriation of company assets on April 17, 1987, when he was employed at another store in Knoxville.

Mr. Taylor's affidavit concerning these two assistant managers is supported by copies of K–Mart's personnel files concerning them.

That Mr. Trentham violated K–Mart's written policy cannot be disputed. In the K–Mart employee handbook, it is stated, "All salvage merchandise is to be destroyed. In no case may such merchandise be discounted or sold to employees." In another booklet, under the heading "LOSS PREVENTION," it is stated, "No merchandise received or removed through Emergency doors without General Manager approval." In a portion of the written policies which deals with merchandise control, it is stated,

> The Loss Prevention Manager must oversee the destruction of all merchandise as discreetly as possible for which the store has received credit and [been] told to destroy. It is this merchandise that if not totally destroyed, will be picked up out of the trash and perhaps returned through the front as a refund. There are to be no auctions for broken or damaged merchandise.

Mr. Taylor, the store manager, testified at his deposition that he was the one who decided to discharge Mr. Trentham from employment. After Mr. Trentham admitted to him that he had taken the infant automobile seats, Mr. Taylor telephoned Mr. Pence, the loss prevention district manager, and Jerry Byrd, the merchandise district manager. Mr. Byrd was Mr. Taylor's immediate supervisor. Mr. Taylor had decided before he called Mr. Byrd that he had no choice but to discharge Mr. Trentham from employment. Mr. Byrd agreed, saying, "Fire him." Mr. Taylor then called Mr. Pence, and "told him what had happened, and I told him that I was going to terminate John and would he come up and be with me when I did it." It was not required that Mr. Pence be present, but Mr. Taylor wanted him there, in part because Mr. Taylor felt uncomfortable about discharging an employee.

Mr. Taylor testified that it did not make any difference to him in deciding to discharge Mr. Trentham from employment whether the infant automobile seats had been damaged or not. He recalled that, "about twelve years ago our Fountain manager had a husband take out a damaged crockpot or something that she had no authorization on, and I terminated her." Mr. Taylor also stated that whether or not Mr. Trentham had taken the infant automobile seats to a dump made no difference, because the violation of policy for which he was discharged from employment consisted

of taking the merchandise from the store without authorization.

Mr. Taylor did testify that, if Mr. Trentham had been authorized by him to take damaged merchandise to a dump, that would not have been a ground for discharging him from employment. "One time I can recollect telling him to take axe mauls because they were steel, and the dumpster was full at the time, and we had nowhere to put them. That's the only time I can ever recollect."

Concerning Mr. Trentham's allegedly poor job performance with respect to completing paperwork, Mr. Taylor testified,

I do remember each time we would get a security check, I would—and John, John and I would be criticized for his paperwork not being up to date. One time I even made out a little list, and we put it up on his wall in the security office to do this this day, this this day, and this this day.

Mr. Trentham was unable to perform two of his paperwork duties as the store's loss prevention manager because of restrictions imposed by Mr. Taylor. For example, Mr. Taylor would allow only specific employees, not including Mr. Trentham, to enter the cash room. Mr. Taylor stated, however, that Mr. Trentham's inability to perform his duty with respect to these two items of paperwork did not reflect negatively on his job performance, because he, Mr. Taylor, did not allow him to perform these duties.

There is other evidence in the record before the Court that Mr. Trentham's performance of his duties other than the apprehension of shoplifters was unsatisfactory. Mr. Hunt, the loss prevention district manager referred to above, wrote on December 22, 1988 a report which indicated extreme dissatisfaction with some aspects of Mr. Trentham's job performance. There is nothing in this report which suggests age bias or discrimination in any manner. However, in considering K–Mart's motion for summary judgment, the Court has not treated evidence such as this as justifying K–Mart's discharge of Mr. Trentham from employment, because K–Mart itself assigned the carrying away of the infant automobile seats as the ground for its termination of his employment.

Mr. Taylor did not discharge Gary Simmons, the stockroom manager who moved the cart of infant automobile seats to the loading dock for Mr. Trentham, from employment because, Mr. Taylor said, Mr. Simmons did that upon Mr. Trentham's instruction.

After he discharged Mr. Trentham from employment, Mr. Taylor decided to elevate Ms. Breeden to the position of loss prevention manager, but only after some time, because he wanted to make certain that she could perform the job. A new employee, Charles McMeans, was hired as a loss prevention employee, subordinate to Ms. Breeden. Mr. Taylor was not aware before he discharged Mr. Trentham from employment that Mr. McMeans was looking for employment, and he did not interview Mr. McMeans before he discharged Mr. Trentham from employment.

K–Mart argues in support of its motion for summary judgment that Mr. Trentham has failed to adduce any evidence of a necessary element of his age discrimination claim, that he was replaced by a younger person. Mr. Trentham argues that he was in fact replaced by the loss prevention employee, Mr. McMeans, who was hired after K–Mart terminated its employment of Mr. Trentham. In an affidavit [doc. 20], Mr. McMeans states that he was employed for three months by K–Mart, beginning on May 22, 1989, and that throughout his employment, his understanding was that Phyllis Breeden was the loss prevention manager at the Clinton Highway store. He states, "Neither Mr. Taylor nor anyone else employed by K mart told me that I was being hired as the Loss Prevention Manager or that I would be promoted to Loss Prevention Manager."

There is, however, some other evidence in the record concerning this matter. The advertisement for applicants for this position which K–Mart placed in a newspaper [doc. 17, ex. 12] designates the position as "K–Mart Security Manager." On his application for employment [doc. 17, ex. 14], Mr. McMeans wrote "security manager" for

the position which he desired. Mr. Pence completed a K–Mart form concerning a training visit made by him to Mr. McMeans on which Mr. McMeans is identified as a loss prevention manager [doc. 17, ex. 16].

K–Mart hired Mr. McMeans on May 22, 1989, several days before Mr. Trentham filed his administrative complaint of age discrimination. K–Mart promoted Ms. Breeden to Mr. Trentham's position, loss prevention manager at the Clinton Highway store, on June 1, 1989. K–Mart has pointed out in a rebuttal brief [doc. 27] that it cannot be said that it promoted Ms. Breeden after Mr. Trentham filed his administrative complaint merely to argue that Mr. Trentham was replaced by an older employee; the letter from the Tennessee Human Rights Commission to K–Mart advising of the filing of Mr. Trentham's complaint and requesting a response to it [doc. 17, ex. 18] is dated June 5, after the promotion of Ms. Breeden. This eliminates the argument that the promotion of Ms. Breeden was a subterfuge, but the Court must still decide whether there is a genuine issue whether Mr. Trentham was in fact replaced by the younger person, Mr. McMeans.

■ The Court feels compelled to give the benefit of the doubt to the plaintiff on this issue, in spite of Mr. Trentham's concession that he was not replaced by a younger person if Ms. Breeden became the lost prevention manager. Whatever Mr. McMeans believed or understood about his position when he filled it, there is evidence from which a rational jury might deduce or infer that K–Mart employed Mr. McMeans to be a loss prevention manager at the Clinton Highway store. While Ms. Breeden moved into Mr. Trentham's position and became Mr. McMeans' superior, it seems apparent that some of Mr. Trentham's former duties became Mr. McMeans' duties in this two-employee department. A mechanical application of the usual four-part formula used to describe an age discrimination plaintiff's burden of production should not be used to dismiss Mr. Trentham's claim on this ground. *Cf. Ackerman v. Diamond Shamrock Corporation,* 670 F.2d 66, 70 (6th Cir.1982) ("A mechanical application of the. *McDonnell Douglas* [*v. Green,* 411 U.S. 792, 93 S.Ct. 1817,. 36 L.Ed.2d 668 (1973)] guidelines might bar the suit of a worthy ADEA claimant. In other cases, an overly mechanical application could supply an ADEA plaintiff with a triable claim where none exists.") *See also, e.g., Rocha v. Great American Insurance Co.,* 850 F.2d 1095, 1101 (6th Cir. 1988), in which the Court of Appeals held that a plaintiff had made out a *prima facie* case in part by showing that his job duties were assumed by younger employees, without showing that any person was hired to replace him or was transferred to fill his position, which was abolished.

There can be no doubt that Mr. Trentham has shown the existence of two other elements of a cause of action for age discrimination under the *McDonnell Douglas* guidelines, that he was within the protected age group at the pertinent time, and that he was discharged from employment. K–Mart has not argued that Mr. Trentham was not qualified for the loss prevention manager's position. Indeed, on April 15, 1989, after the termination of Mr. Trentham's employment, Mr. Taylor, the Clinton Highway store manager, wrote that Mr. Trentham "was excellent at catching shoplifters and internal theft" [doc. 17, ex. 2]. Any argument that Mr. Trentham was not qualified because he carried merchandise away without authorization would collapse the pretext analysis under *McDonnell Douglas* and its progeny into the evaluation of the plaintiff's *prima facie* case. *See Wilkins v. Eaton Corporation,* 790 F.2d 515, 521 (6th Cir.1986), in which the Court of Appeals held that the plaintiff pilot was qualified to fill his position because he was a good pilot regardless of his refusal to complete a flight checklist which he alleged to be discriminatory, distinguishing between this element of his *prima facie* case and the issue whether his refusal to use the checklist was a nondiscriminatory reason for terminating his employment or was a pretext.

Having concluded that the plaintiff has made out, at least for the purpose of resisting a motion for summary judgment, a *prima facie* case, and it being apparent

that the defendant K–Mart has come forward with evidence of a legitimate, nondiscriminatory justification for discharging Mr. Trentham from employment, the Court must proceed to the chief issue presented by the motion for summary judgment, whether a rational jury could find on the basis of the evidence in this record that K–Mart used the incident concerning the infant automobile seats as a pretext to discriminate against Mr. Trentham because of his age. "[W]hen an employer meets its burden of articulating a legitimate nondiscriminatory reason for discharge, the presumption of discrimination created by establishing a *prima facie* case is destroyed." *Wilkins v. Eaton Corporation, supra,* 790 F.2d at 521 (citations omitted). The plaintiff must then come forward with "evidence from which a reasonable jury could conclude that age was the *more likely* reason for ... discharge, rather than merely a speculative possibility." *Id.* at 523 (citations omitted) (emphasis in original). *Accord, Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 230 (6th Cir.1990) (citations omitted).

█ It is important to note, in this regard, what Mr. Trentham's case is not. It is not a case of a pattern and practice of age discrimination, in spite of the fact that Mr. Trentham pleaded this theory originally. There is no evidence, statistical or otherwise, in the record before the Court concerning K–Mart's treatment generally of employees in the protected age group. If anything, the promotion of Ms. Breeden after the discharge of Mr. Trentham from employment works against this theory.

█ Mr. Trentham's case is also not a disparate treatment case. If the plaintiff were confined to this theory, he could not succeed. The fact that Mr. Simmons, the stockroom manager, was not disciplined for his role in the incident concerning the infant automobile seats is explained fully by the fact that he moved the seats to the loading dock upon the instruction of the loss prevention manager, Mr. Trentham. Mr. Taylor's affidavit concerning K–Mart's discharges from employment of two younger assistant managers caught misappropriating company funds or other assets shows unequivocally that the treatment of these employees outside the protected age group was not disparate from the treatment of Mr. Trentham. The plaintiff complained in his deposition that K–Mart did not prosecute these employees, but the act of discrimination alleged in this case is discharge from employment. Discharge and criminal prosecution cannot be treated as the same for the purpose of showing disparate treatment in this case.

The only other incident advanced by Mr. Trentham as evidence of disparate treatment, the incident concerning an assistant manager who had a K–Mart mechanic "torch" his truck for the purpose of insurance fraud, is no evidence of age discrimination. Mr. Trentham established this in his own deposition [doc. 17, app.] when he testified that the assistant manager's "daddy was a security director in the North Carolina district." Evidence of nepotism without more cannot be transformed into evidence of age-biased disparate treatment.

█ This leaves Mr. Trentham with the burden of proving a case of intentional age discrimination focused upon K–Mart's act of discharging him from employment. As is stated above, the issue at this stage of the litigation, when Mr. Trentham is opposing the summary judgment sought by K–Mart, is whether a rational jury could find that K–Mart used the incident concerning the infant automobile seats as a pretext to discharge Mr. Trentham from employment because of his age. There are available to Mr. Trentham three methods by which he might show a pretext: showing that the stated ground for his discharge from employment had no basis in fact, showing that the stated ground was not the actual factor which motivated his discharge from employment, and showing that the stated ground was insufficient to motivate the discharge. *Chappell v. GTE Products Corporation,* 803 F.2d 261, 266 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987) (citation omitted). Since direct evidence of age discrimination is rarely available, a plaintiff may prove it indirectly or circumstantially

by showing that the defendant's stated ground for the discharge of the plaintiff from employment is not believable. *Kraus v. Sobel Corrugated Containers, Inc., supra,* 915 F.2d at 231 (citation omitted). It is obvious that evidence adduced by a plaintiff to make out his *prima facie* case will often also be probative of a pretext. *Id.* at 230 (citation omitted).

Mr. Trentham must rely upon the second method to prove a pretext in this case. There is no dispute that he removed the infant automobile seats from the K–Mart store. Indeed, he stated in writing on April 10, 1989 [doc. 17, ex. 9], "I realize I should have destroyed the merchandise." As for whether the removal of the infant automobile seats was sufficient, if it was the true reason, to justify the discharge of Mr. Trentham from employment, Mr. Trentham's assertion that it was not is unsupported in this record. It is well established that Mr. Trentham violated several written K–Mart policies in removing the infant automobile seats from the store, and that his violation of these policies was rendered more serious by his status as the store loss prevention manager. Mr. Taylor recalled one similar occurrence involving another employee, and testified that he had felt compelled to discharge her from employment, too.

■ Put simply, the question presented is whether a rational jury could conclude that K–Mart's witnesses are not being truthful when they say that the incident concerning the infant automobile seats is the only reason that Mr. Trentham lost his job, and that age discrimination played no role in the termination of his employment. The Court feels constrained to agree with K–Mart and to answer this question "no," which it can do without making any credibility determination. The only direct evidence of age bias in this record consists of the comments made by the loss prevention district manager, Mr. Pence. Age-biased comments made by a managerial employee not responsible for the decision to terminate a plaintiff's employment cannot be considered in determining whether age was the motivating factor in the decision to terminate. *See LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1412 (7th Cir.1984) (citation omitted).[1]

■ However, assuming that a rational jury could find, perhaps after considering the evidence of the conference among Messrs. Trentham, Taylor, and Pence immediately before Mr. Trentham was discharged from employment, that, in spite of what Mr. Taylor maintains, Mr. Pence shared responsibility for this decision, this slim evidence of age bias still is not enough to resist K–Mart's motion. Months passed between Mr. Pence's comments and the discharge of Mr. Trentham from employment. Between the time when Mr. Pence made his comments and the termination of Mr. Trentham's employment, there intervened the incident in which Mr. Trentham carried the infant automobile seats away from the store. As is stated above, the evidence that this violated written policies is clear and overwhelming. Mr. Trentham conceded that he knew the rule that damaged merchandise was not to be carried from the store, and that he should have destroyed this merchandise.[2]

■ Mr. Trentham's argument against this is that he had engaged in this sort of conduct before, that enforcement of the written policies "never was right to the tee anyway." Without any additional direct or circumstantial evidence of age bias, this is merely an argument that K–Mart was silly in enforcing its policies in a literal-minded fashion, or was unjust in enforcing them inconsistently. In either case, the Age Discrimination in Employment Act cannot be used by this Court to "focus on the soundness of the employer's business judgment."

---

1. For this reason, the Court has not considered in ruling on K–Mart's motion for summary judgment the comments ascribed by Mr. Trentham to Mr. Hunt. There is no evidence that Mr. Hunt played any role in discharging Mr. Trentham from employment.

2. Since Mr. Taylor stated that the ground for his decision was the carrying of the infant automobile seats from the store, the Court must treat as irrelevant the evidence concerning Mr. Trentham's stated intention to sell this merchandise at a yard sale.

 

*Wilkins v. Eaton Corporation, supra,* 790 F.2d at 521 (citations omitted).

The plaintiff has admitted in a brief [doc. 19] that the analysis of his age discrimination claim must be the same under the Tennessee Human Rights Act as under the federal law. T.C.A. § 4–21–101(a)(1); *Bruce v. Western Auto Supply Company,* 669 S.W.2d 95, 97 (Tenn.App.), *application for permission to appeal denied, id.* (Tenn.1984). For the reasons stated, the Court will dismiss Mr. Trentham's Age Discrimination in Employment Act and Tennessee Human Rights Act causes of action.

■ This leaves for consideration Mr. Trentham's cause of action under Tennessee law for retaliatory discharge for his assertion of a right of action under the Tennessee Workers Compensation Law. The parties have devoted much of their argument to the issue whether Mr. Trentham's collapsed artery and its sequelae were or were not job-related for the purposes of the Workers Compensation Law. This is irrelevant. The issue is whether Mr. Trentham was discharged from employment in retaliation for asserting a right under the Workers Compensation Law, not whether any claim made by him was successful ultimately. *Clanton v. Cain–Sloan Company,* 677 S.W.2d 441 (Tenn. 1984); *Johnson v. Saint Francis Hospital, Inc.,* 759 S.W.2d 925 (Tenn.App.), *permission to appeal denied, id.* (Tenn.1988).

■ What the Court has stated above in this Memorandum Opinion, that no rational jury could conclude otherwise than that K–Mart discharged Mr. Trentham from employment because of his violation of company policy in carrying the infant automobile seats from the store, compels the dismissal of his retaliatory discharge cause of action, too. A necessary element of such a cause of action is that there be a causal link between the discharge from employment and the assertion of a right under the Workers Compensation Law. *Johnson v. Saint Francis Hospital, Inc., supra,* 759 S.W.2d at 928 (citations omitted). The plaintiff has not shown such a causal link in this case, and the defendant has negated it conclusively.

The Court accordingly will grant the defendant K–Mart's motion for summary judgment, and dismiss this civil action.