896 F.Supp. 743 (1995)
Paul W. HARPER
v.
BP EXPLORATION & OIL CO. d/b/a BP Oil Company.
No. 3:93-1025.
United States District Court, M.D. Tennessee, Nashville Division.
August 23, 1995.
*744 *745 *746 Phillip Lester North, North, Pursell & Ramos, Nashville, TN, for plaintiff.
Keith D. Frazier, Baker, Donelson, Bearman & Caldwell, Nashville, TN, Curtis L. Mack & Sonja F. Bivins, Mack & Bernstein, Atlanta, GA, for defendant.

MEMORANDUM
JOHN T. NIXON, Chief Judge.
This action arises out of a contractual relationship between Paul Wilson Harper and British Petroleum Exploration and Oil Company (BP). Plaintiff filed this racial discrimination claim against BP, et al., alleging conduct in violation of 42 U.S.C. § 1981 of the Civil Rights Act; Tenn.Code Ann. § 4-21-101, et seq. of the Tennessee Human Rights Act; and 15 U.S.C. § 2801, et seq. of the Petroleum Marketing Practices Act.[1] Plaintiff further raises claims for breach of contract, outrageous conduct, negligent misrepresentation and pattern and practice of discriminatory behavior against African Americans by BP. This action was originally filed in state court but was removed to federal court by Defendant, BP.
Plaintiff contends that he was discriminated against on the basis of his race with respect to the non-renewal of his Dealer Lease And Supply Agreement for the BP gasoline station located on 2811 John Merritt Boulevard in Nashville, Tennessee, and with respect to the awarding of the BP gasoline station located on Charlotte Avenue in Nashville and other stations.
Although Plaintiff seeks a substantial amount of relief in compensatory and punitive damages, inter alia, this case was bifurcated for trial and only the issue of liability is currently before the Court.

FINDINGS OF FACT
BP is engaged in the petroleum industry. BP has retail operations which are classified in three different categories: (1) companyoperated stations; (2) dealer lessee stations; and (3) Authorized Dealer Agreement stations (ADAs). Company-operated stations are operated by Company hires and they sell gasoline directly to the public. Dealer lessee stations are operated by independent dealers who lease facilities from BP and purchase gasoline and other supplies from BP. ADA stations are those operated by independent dealers who either own their own facilities or lease their facilities from a third party. ADA dealers purchase gasoline and other supplies from BP, but do not pay a monthly rent to BP.
The Plaintiff, Paul Wilson Harper, is an African-American male who has served several years as a dealer lessee with BP operating a BP gasoline station located on 2811 John Merritt Boulevard in Nashville, Tennessee.[2] Beginning in 1989, Mr. Harper made numerous requests for an additional BP station. In 1989, Paul Harper asked his Dealer Representative, Claudine Drueke, and his Division Manager, Ronnie Manton, for a second location of Murfreesboro Road.[3] (Trial Tr. 87-88, 128-129). In that same year, Ronnie Manton, without notice to Plaintiff, offered John P. Kendrick, a white applicant, the same Murfreesboro Road station, as well as *747 an additional station on Murfreesboro Road. (Trial Tr. 877-878, 902, 906, 948). The Murfreesboro Road station in which Mr. Harper had expressed an interest was subsequently leased, without notice to Plaintiff, to a white applicant who was not an existing dealer. (Trial Tr. 87-88, 128-129).
Mr. Harper wrote Ronnie Manton on March 5, 1991, expressing his interest in stations on Charlotte Road and Murfreesboro Road. (Pl.'s Tr. Ex. 5; Trial Tr. 93-94). Manton received this letter and, in reply, wrote Mr. Harper assuring him that he would give Harper full consideration for the Charlotte station if it ever became available. (Trial Tr. 419, 430, 451). Having heard nothing from Manton for nearly a year, Harper delivered a second letter on February 26, 1992, confirming his interest in the Charlotte Avenue station, and expressing an interest in the Brick Church Pike station and "any other high volume station." (Pl's Tr. Ex. 7). Although Manton received this letter, he did not respond to it. (Trial Tr. 430, 838-839). Mr. Harper continually asked Ms. Claudine Drueke, a dealer representative for BP, about the status of Charlotte station, and showed her Manton's letter assuring him that he would be considered.[4] Drueke stated affirmatively that she would advise Harper when the Charlotte Avenue station became available. (Trial Tr. 95-96, 184).
When Mr. Harper was denied the Charlotte Avenue station, Mr. Manton was aware that Harper was to be divested of his current station. On May 13, 1992, BP prepared a document entitled "1992 Service Station Restructuring Guidelines." This document listed the numerous stations that were to be divested from the BP system by virtue of lease non-renewals. Manton was in receipt of this divestiture list, and aware that Harper would soon be divested, when he rejected Harper as the dealer for the Charlotte Avenue station. (Trial Tr. 840-841).
The 1992 Service Station Restructuring Guidelines required BP to relocate "quality dealers." The 1992 Service Station Restructuring Guidelines provided: "When possible, relocate quality dealers working at targeted closed stations to another station pumping over 110,000 gallons per month." (Trial Tr. 722-723; Def's Tr. Ex. 90). The Restructuring Guidelines provided no definition of "quality dealers." (Trial Tr. 758). Mr. Harper was never notified of these guidelines, nor was he ever informed that exemptions could be granted to the divestiture requirements. (Trial Tr. 1048-1049). BP divested plaintiff's John Merritt Boulevard station and did not relocate him to any other station.

CONCLUSIONS OF LAW

A. The Tennessee Human Rights Act (THRA)
Defendant argues that Plaintiff is not entitled to relief under the Tennessee Human Rights Act (THRA) because the Act was designed to prohibit discrimination in employment or public accommodations and housing and the absence of a provision in the THRA parallel with or similar to Section 1981 addressing discrimination in the formation and/or termination of contracts or business relationships leads to the ineluctable conclusion that such claims are not within the scope and jurisdiction of the Act and that Plaintiff is not entitled to relief under the THRA. No authority is cited by Defendant in support of this proposition.
The Court finds that the THRA is to be analyzed in the same fashion as claims under the Civil Rights Acts. See e.g., Trentham v. K-Mart Corp., 806 F.Supp. 692, 705 (E.D.Tenn.1991), aff'd 952 F.2d 403 (6th Cir. 1992). See also Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn.App.1984). The Court further finds that because the THRA is to be read pari materia with the federal Civil Rights Acts, which now address discrimination beyond the realm of employment, the Tennessee statute must likewise be applied. Therefore, the Court holds that, like § 1981, the THRA addresses discrimination in the formation and/or termination of contracts or business relationships.

*748 B. Statute of Limitations
Defendant argues that Plaintiff is not entitled to relief under § 1981 based on BP's decision not to enter into a franchise agreement with him regarding the Charlotte Avenue station because such claim is time-barred due to the fact that § 1981 has no specifically stated statute of limitations and that, therefore, the controlling period is that which is provided by state law. The Defendant's contention is meritorious in that § 1981 does not provide a statute of limitations and, therefore, federal courts apply the relevant state limitations period to cases invoking the federal act. Jackson v. Richards Medical Co., 961 F.2d 575 (6th Cir.1992). However, while the statute of limitations may be borrowed from state law, it is federal law that determines the date upon which the statute of limitations commences. Michigan United Food v. The Muir Company, 992 F.2d 594, 598 (6th Cir.1993).
In Tennessee, the one-year limitations period under Tenn.Code Ann. § 28-3-104 has been consistently applied as the appropriate limitations period. Id. This statute requires the filing of the action within one year after the cause has "accrued." Tenn.Code Ann. § 28-3-104(a). However, civil rights actions accrue only after the discriminatory act takes place and the claimant is notified of it. EEOC v. Firestone Tire & Rubber Co., 650 F.Supp. 1561, 1565 (W.D.Tenn.1987); Kessler v. Board of Regents, 738 F.2d 751, 754 (6th Cir.1984).
In the present case, Plaintiff received no notice from BP that the various stations which he had requested had been leased to white applicants. Instead, Plaintiff was constantly reassured by BP representatives that he would be given consideration should a location become available. Plaintiff's knowledge of the lease of the Charlotte Avenue station was occasioned by a serendipitous meeting with the white applicant in the Spring of 1993, well within the one-year statute of limitations period. The Court finds that Defendant's argument that Plaintiff should have known of the lease of the Charlotte Avenue station through attendance at dealer meetings is without merit. Therefore, the Court finds that Plaintiff's claim for relief under § 1981 based on BP's decision not to enter into a franchise agreement with him regarding the Charlotte Avenue station and other locations is not time-barred.

C. The Petroleum Marketing Practices Act (PMPA) & Non-renewal
Plaintiff contends that the decision not to renew his BP Oil Company lease at the John Merritt Boulevard station was the result of racial discrimination and was in violation of the PMPA which requires notice and a good faith basis for the non-renewal of a dealer station. However, BP's notice of non-renewal to Plaintiff stated that franchise operation at the John Merritt Boulevard location would prove uneconomical to the franchise despite any reasonable changes or additions to provisions of the franchise which may have been acceptable to the franchisee. (Pl's Tr. Ex. 10; Trial Tr. 107-108). It is clear from the record that a number of stations were to be divested from the BP system under the 1992 Service Station Restructuring Guidelines via lease non-renewals. Many white lessees were also to be divested and were not afforded the earliest possible notice.
Therefore, the Court finds that BP's decision not to renew Plaintiff's contract was strictly a financial decision, and was not made to discriminate against the Plaintiff on the basis of his race. The record indicates that BP decided to divest Plaintiff's store for the same reason Plaintiff wanted a high volume store  to become more profitable. Thus, BP did not violate the PMPA or § 1981 with regard to the non-renewal of Plaintiff's lease agreement. The Court is of the opinion that BP substantially complied with the provisions of the PMPA by submitting adequate notice to Plaintiff regarding its decision to close the store for financial reasons and by offering Plaintiff the opportunity to purchase the store. Thus, Plaintiff's claim for breach of contract must fail.

D. Disparate Treatment
Plaintiff contends that BP's failure to lease him an additional location, especially in light of the termination of his existing lease, *749 was motivated by, and was the result of, racial discrimination. Under the rubrics of 42 U.S.C. § 1981, all persons have the same rights to make and enforce contracts as are enjoyed by white citizens. 42 U.S.C. § 1981(a). The term "make and enforce contracts" is defined to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).
When evaluating claims of racial discrimination under § 1981, it is important to note that the Title VII disparate-treatment evidentiary framework applies to claims of racial discrimination under § 1981. Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir.1992). Therefore, under the McDonnell Douglas/Burdine burden shifting formula, Plaintiff can establish a prima facie case of discrimination by showing by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) he was rejected despite his qualifications, and (4) BP continued to seek applicants for the position or filled the position with a nonmember of the protected class. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
Then, if the Plaintiff establishes a prima facie case, the burden shifts to the Defendant to articulate a legitimate nondiscriminatory reason for the alleged discriminatory action. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. If defendant succeeds in carrying this burden, the Plaintiff must have an opportunity to show that the nondiscriminatory reasons offered by defendant were a pretext for discrimination. Id. A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. As well, where a defendant has mixed motives, the plaintiff may show that it is more likely than not that a protected characteristic "played a motivating part in [the] employment decision." Price Waterhouse v. Hopkins, 490 U.S. 228, 244, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989).
The Court finds that Mr. Harper has established a prima facie case of racial discrimination by showing that: (1) he is a member of a protected class in that he is an African-American male; (2) he applied for and was qualified for the location which was available; (3) despite being qualified, he was not given the location; and (4) after he was passed over Defendant gave the location to a similarly situated white male. The record reflects that Mr. Harper applied for stations that were available. Beginning in 1989, Mr. Harper made numerous requests for an additional BP station. In 1989, Paul Harper asked his Dealer Representative, Claudine Drueke, and his Division Manager, Ronnie Manton, for a second location on Murfreesboro Road. Mr. Harper wrote Ronnie Manton on March 5, 1991, expressing his interest in stations on Charlotte Road and Murfreesboro Road. Mr. Harper delivered a second letter on February 26, 1992, confirming his interest in the Charlotte Avenue station, and expressing an interest in the Brick Church Pike station and any other high volume station. During Manton's tenure as Division Manager in Nashville (from March, 1989 through October, 1992), several locations became available for lease  perhaps as many as ten. One such available station was located at I-24 and Bell Road. This station became available after Harper expressed his interest in November 18, 1992.
The record reflects that Mr. Harper was qualified for the Charlotte Avenue station and the other stations that were available. Mr. Harper presented BP with substantial credentials and experience. He attended various trade schools, received business training at Exxon Oil Company, served as an Exxon manager, and a Gulf dealer. He had over twenty years of experience in the petroleum industry. For seven years, he operated two Gulf stations simultaneously. While BP had no written policy of qualities desired in a dealer, Defendant did acknowledge that a *750 candidate's petroleum experience was considered, and indeed emphasized it as a credential.[5] Harper had received numerous citations, awards, and recognitions as an outstanding dealer. (Trial Tr. 85-86). Despite being qualified, Mr. Harper was repeatedly passed over and was not given the Charlotte Avenue station or any other station. In each situation, after Plaintiff was passed over, Defendant continued seeking other applicants or gave the location to a similarly situated white male. With regard to one of the two Murfreesboro road locations and the Charlotte Avenue station in particular, it is clear from the record that BP passed over Plaintiff to give preferential treatment to a less qualified white male, John P. Kendrick. BP's own performance evaluations consistently ranked Harper above Kendrick, and prior to his selection for the Charlotte Avenue station in June, 1992, Kendrick had absolutely no background or experience in the petroleum industry.
Because the Court finds that Mr. Harper has established a prima facie case, the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for not selecting Plaintiff. In its defense, BP initially stated only that Mr. Harper's allegations regarding opportunities to move up in the company were barred by the one year State statute of limitations applicable to § 1981 claims. However, the Court has disposed of this defense. BP also claims, as a nondiscriminatory reason for its decision not to relocate Mr. Harper, that Mr. Harper was not qualified to be a candidate for relocation because he was not a "quality dealer" in accordance with BP's Restructuring Guidelines[6]. While BP's 1992 Service Station Restructuring Guidelines required BP to relocate quality dealers, the Guidelines did not provide a definition of what constitutes a "quality dealer."
However, upon BP's articulation of a legitimate nondiscriminatory reason, the burden shifts back to Plaintiff to show pretext. The Court finds that Plaintiff has shown pretext. Mr. Sherman Charles Scott, a twenty-seven year employee of BP and the District Manager for the Nashville Division of BP since October of 1992, acknowledged that: (1) a "quality dealer" is one who has complied with the terms of his contract; (2) Mr. Harper was in compliance with the terms of his contract; and (3) therefore, Mr. Harper was a quality dealer in good standing with the company. (Trial Tr. 998, 1044-1046). Also, BP's Dealer Representative, Claudine Drueke, acknowledged that Harper was a qualified applicant for the Charlotte Avenue station.[7] (Trial Tr. 281). In fact, under the BP system if a lessee was not a quality dealer, BP would terminate his or her contract. (Trial Tr. 854). Harper's contract, by contrast, was renewed several times with Gulf, and several times with BP over the course of 13 years. (Trial Tr. 1042).
Therefore, the Court finds that Mr. Harper was indeed a "quality dealer," and that BP's allegedly nondiscriminatory reasons for its failure to relocate Mr. Harper are merely *751 pretextual. Furthermore, the Court finds that the actions of BP in failing to relocate Plaintiff to another location is in violation of its own policy of retaining quality dealers with experience and constitutes purposeful racial discrimination in direct violation of § 1981 and the THRA.

E. Pattern and Practice of Racial Discrimination
Plaintiff alleges that BP has established a pattern and practice of racial discrimination against African-Americans which is evidenced by several items relating to disparate impact which include: (1) BP's current racial composition; (2) BP's failure to hire more minorities; (3) BP's policy of excluding black dealers from stations located in white neighborhoods; and (4) BP's lack of a minority recruitment policy. However, the Court finds that disproportionate impact alone does not make a showing that a defendant's practices are violative of § 1981. See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 390, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Nevertheless, impact evidence may be considered in determining whether discrimination was a motivating factor.
The impact evidence in this case only serves to buttress and reinforce the Court's earlier finding that discrimination was a motivating factor in BP's decision not to relocate Plaintiff. Thus, while it seems from the impact evidence alone that BP's record is lacking with regard to hiring and retaining African Americans, Plaintiff has failed to provide evidence in the form of sufficient statistical data, inter alia, to show that BP has an established policy and practice of racial discrimination. The Court further finds that Plaintiff's claims of outrageous conduct and negligent misrepresentation are without merit, and therefore, must fail.

CONCLUSIONS
For the reasons set forth above, the Court finds that plaintiff has established a violation of his rights under § 1981 and the THRA by proving that BP engaged in purposeful racial discrimination.
NOTES
[1] In addition to BP, Plaintiff also asserted claims against Ronnie Manton, Claudine Drueke and Sherman Scott. However, during the trial of this matter, Plaintiff agreed to dismiss these individuals in exchange for BP's agreement that it would not assert as a defense in this matter that it was not vicariously liable for the actions of these individuals with respect to the specific allegations raised in this action.
[2] Prior to becoming a dealer lessee with BP, Plaintiff served as an Exxon manager and a Gulf dealer, having gained over twenty years of experience in the petroleum industry. (Trial Tr. 69-73).
[3] Ronnie Manton was BP's Division Manager for the Nashville division from March, 1989 through October, 1992. Manton has been employed with BP over twenty-six (26) years, and has approved or recommended dealers for two hundred (200) to three hundred (300) stations. (Trial Tr. 411-412, 880-881, 889).
[4] Claudine Drueke was a dealer representative at Gulf Oil Company during the period when Mr. Harper was a Gulf dealer. (Trial Tr. 251).
[5] BP was inconsistent in considering the significance of a candidate's petroleum experience. Ronnie Manton insisted that experience was not the most important factor in evaluating a candidate. (Trial Tr. 859). This testimony directly contradicts the prior sworn testimony of James Boulware, a BP representative. Boulware testified in December, 1994, (in a case styled Cornelius Howard v. BP Oil Company held in the Northern District of Georgia) that the most significant criteria was "experience, experience, experience, experience." BP has objected to the admissibility of this testimony, however, the Court found this testimony admissible under the Federal Rules of Evidence and found BP's objections to be without merit.
[6] In support of this reason, BP cited items such as the lack of station cleanliness and a low volume of gasoline being pumped at the John Merritt Boulevard location. Based upon the evidence in the record, the Court finds these items lacking in merit.
[7] At a post-trial deposition, Claudine Drueke, a 20 year employee of BP, revealed that she was terminated from BP on March 24, 1995 (approximately two weeks after the conclusion of this trial), partly due to her testimony at trial. (Post-trial Drueke dep. 12). Drueke further admitted that she acquiesced to Manton's desire for Mr. Kendrick over Mr. Harper for the Charlotte Avenue station when it became apparent to her that her job would be in jeopardy if she continued to advocate for Paul Harper. (Post-trial Drueke dep. 24-26). BP has objected to the admissibility of Drueke's post-trial deposition testimony and the Court has found those objections to be without merit and unworthy of credence.