Sheldia A. SUNSTROM, Plaintiff,

v.

SCHERING–PLOUGH CORPORATION,
Key Pharmaceuticals Division,
Defendant.

No. 3:92–cv–878.

United States District Court,
E.D. Tennessee,
at Knoxville.

Feb. 16, 1994.

C. Mark Troutman, McCord & Troutman, P.C., Knoxville, TN, for plaintiff.

Frederick J. Lewis, Thomas L. Henderson, Delaine R. Smith, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for defendant.

## MEMORANDUM OPINION

JARVIS, Chief Judge.

This is an employment discrimination action brought by plaintiff Sheldia A. Sunstrom against her former employer, The Schering–Plough Corporation, filed under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621, *et seq.*, Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e, *et seq.*, and the Equal Pay Act (EPA), 29 U.S.C. § 201, *et seq.* Currently pending are defendant's motions to strike plaintiff's request for compensatory and punitive damages and motion for partial summary judgment [Court File # 7] and defendant's motion for summary judgment [Court File # 17]. Because I am of the opinion that defendant's motion for summary judgment should be granted, defendant's motion to strike and for partial summary judgment [Court File # 7] will be denied as moot.

### I.

### Plaintiff's Factual Allegations

The following factual allegations are considered in the light most favorable to the plaintiff. Plaintiff was hired as a pharmaceutical sales representative by Key Pharmaceuticals, Inc. on January 5, 1986. Although she was initially assigned to defendant's Nashville sales district, at all times during her employment with Key and Schering–Plough she worked out of her home in Knoxville. All of defendant's pharmaceutical sales representatives worked out of their homes and their jobs consisted of selling defendant's pharmaceuticals through contacts with physicians in their assigned areas.

Plaintiff's immediate supervisor at the time of her hire was a district manager named Mike Tilbury. Tilbury was subsequently promoted to regional director and Tom Halstead became plaintiff's district manager in March or April of 1986. In December, 1988, Halstead transferred to another district and Jeff Jordan became plaintiff's district manager. Approximately two and a half years later, when plaintiff filed a complaint with the Tennessee Human Rights Commission, she filed an affidavit in support of her complaint. With regard to the period in 1989 when Jeff Jordan was her district manager, plaintiff stated the following in her affidavit:

(1) In July, 1989, Jeff Jordan, district manager of District # 16, stated that David Hodges, Kevin Paschall, and Don O'Guin, members of District # 16, had made more money and received higher percentages and salary raises plus performance bonuses. He stated the reason was because the men were married with wives and children and I was a single divorced woman and I made too much money being a woman. He also stated that the men had been making more money for four years, because the prior management of Tom Halstead had favored these men, and that he had to follow the same management style and not change the rules.

(2) In July, 1989, Jeff Jordan informed me that I could not be considered for any promotion or sales trainer, because it would have to be given to Don O'Guin, Patrick White, David Hodges or Kevin Paschall! He stated that it was a job for a man, not a woman. He told me that I made too much money anyway. Jeff Jordan stated that I had purchased a home, and the company provided me with a company car, and I was a divorced, single, woman and informed me to let the promotion rest. He stated I had it all and to just be content with what I had.

In August, 1990, an expansion district, the Greater Charleston Sales District, was established, and plaintiff's territory became part of this new district. While in the Greater

Charleston District, plaintiff reported to district manager Robert Jarvis who, in turn, reported to regional director Mac Wright.

During plaintiff's employment with defendant, defendant's sales representatives were required to keep records of their activities on two forms known as the Epsilon (or "Call") Cards and Weekly Activity Reports. These cards were filled out by the sales representatives to demonstrate when they had made calls on a physician and to indicate pharmaceutical samples that had been left with a physician. Shortly after plaintiff began working for the defendant, Congress passed the Pharmaceutical Drug Marketing Act of 1987, which regulates the distribution of prescription drug samples and requires a physician's signature to be obtained whenever a sales representative leaves a sample of prescription drugs. Because defendant's sales representatives worked out of their homes, the Epsilon Cards and Weekly Activity Reports were essential for defendant to determine whether its sales representatives were making their required calls, and how much they were working. Additionally, defendant relied on these records to design marketing and promotional programs and to account for sample drugs dispensed to physicians.

Defendant has submitted the affidavit of Robert Jarvis, plaintiff's district manager in late 1990. Mr. Jarvis states that in late 1990, he began having concerns over plaintiff's call activities and compliance with company policies about calling on physicians. Accordingly, he reviewed information from the Epsilon Cards with regard to the sales call activities in plaintiff's territory. Mr. Jarvis' audit of this Epsilon information revealed some discrepancies with respect to plaintiff's reported sales activity. Mr. Jarvis described those discrepancies as follows:

(a) November 6, 1990—Four (4) cardiologists in the same group were reported as calls; however, no signatures or samples were left. Further, I verified that at least one (1) of the four (4) physicians, Dr. Joe Smith, was unavailable that day as he worked in a local hospital all day.

(b) November 15, 1990—Four (4) cardiologists of the same group were reported as calls; however, no signatures or samples were left. Further, I verified that only one (1) physician, Dr. Steven Dill, was available in his office on that day. Of the other physicians, one (1) physician, Dr. Joseph Minardo, was off; another, Dr. Lawrence Hookman, was at a satellite office; and the third, Dr. Russell Blakely, worked in one of the local hospitals all day. These facts indicate that the reported sales activity was false.

(c) January 29, 1991—Two (2) physicians, Dr. Orlanda Lowry, III, IM, and Dr. David Walker, IM, were reported as calls; however, no signatures or samples were left. Further, Dr. Lowry was off that day and Dr. Walker has refused for some time to see Sales Representatives, indicating that the reported sales activity was false.

(d) January 29, 1991—A call to one (1) internal medicine physician was reported; however, no signatures or samples were left. Further, I verified that that physician did not report in to his office all day, indicating that the reported sales activity was false.

(e) January 29, 1991—A call was reported to Dr. John Horner; however, Dr. Horner was off that day and did not come in to his office, indicating that the call report was false.

Mr. Jarvis states in his affidavit that as a result of these discrepancies he determined that further investigation of her actual activity was necessary. In an effort to determine if there was any difference between the time plaintiff reported to the company and the time she actually spent making calls, on January 21, 1991, affiant, along with a witness, John Ruch, sat outside of plaintiff's home beginning at 6:00 a.m. in order to determine how long she was actually away. Mr. Jarvis reported that she first left her home at 11:35 a.m. and returned at 1:01 p.m. He further reported that she left again at 1:35 p.m., returned at 4:09 p.m., and did not leave again. Mr. Jarvis reported that he subsequently compared plaintiff's activity reports and his voice mail messages to this information and that, despite the fact that plaintiff spent a total of approximately four hours away from her house on that date, she failed to report that she had not engaged in sales

activity through the normal working hours of January 21.

Mr. Jarvis reported in his affidavit that for each call on which she actually left samples during this period, she left an inordinate amount of samples. He felt that this "heavy" sampling indicated an effort to reduce the accumulation of sample inventory resulting from the excessively low number of actual calls. Mr. Jarvis also stated that further investigation into plaintiff's activities raised questions as to discrepancies and/or inconsistencies in her expense reports.

Mr. Jarvis forwarded the results of his investigation to Mr. Charles Brown in the defendant's personnel office. Following the submission of the results of this investigation, Mr. Jarvis continued to monitor the plaintiff's activities and discovered several additional discrepancies with regard to her calls.

On March 8, 1991, Mr. Jarvis met with Mac Wright, the regional director, and plaintiff. Plaintiff was asked about each of these events and, according to Mr. Jarvis, failed to provide a satisfactory explanation for any of them. After that meeting, Jarvis and Wright called Charles Brown and discussed the situation with him. Jarvis recommended that plaintiff be terminated for falsification of company records and inappropriate conduct. Mr. Wright and Mr. Brown agreed with that recommendation, and Jarvis and Wright terminated her.

Mr. Jarvis states that he does not know of any other sales representatives employed by defendant who has engaged in the same type of misconduct and that if he had learned of any, he would have recommended their termination also.

Plaintiff describes the events of March 7, 1991 somewhat differently. She alleges that on March 7 her immediate supervisor, Mr. Jarvis, called her to a meeting in Knoxville. The purported reason for the meeting was to discuss a wholesale drug sales promotion. She states in her affidavit that, outside the door of Mr. Jarvis' hotel room, he advised her for the first time that his supervisor, Mac Wright, was present and they wanted to discuss some things with her. At no time prior to the meeting was she advised of the purpose of the meeting or was she given an opportunity to prepare for the specific allegations that would be made against her. During the meeting, plaintiff was interrogated by Mr. Wright as to her work records. Plaintiff stated that she perceived the interrogation to be very swift and felt that she did not have an opportunity to adequately respond. She was both shocked and surprised by the interrogation. She offered to take Mr. Wright and Mr. Jarvis to see the doctors to confirm that her reports were accurate, but that offer was refused. Plaintiff also contends that she had detailed record call books which she kept which described her work days, which records were turned over to Mr. Wright and Mr. Jarvis on March 8, 1991, upon her termination.

Plaintiff denies any falsification of the call records. In her affidavit in response to the motion for summary judgment, plaintiff explains the claimed discrepancies in detail. Most of the explanations involve claims that she actually saw these physicians at various hospitals or in their satellite offices. She also offered an explanation of her activities on January 21, 1991, beginning with a visit to Baptist Hospital sometime that morning between 5:00 and 5:30 a.m. Plaintiff contends that defendant performed an inadequate investigation of the charges against her since Mr. Jarvis never actually talked to any of the physicians who plaintiff allegedly called, but simply spoke to someone in their offices.

The defendant contends that as a matter of law plaintiff cannot establish violations of Title VII, the ADEA, or the EPA.

## II.

### Summary Judgment Standards

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the

moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is not material unless it is one that "makes a difference" in the challenged adverse employment action. *Kendall v. Hoover Company*, 751 F.2d 171, 174 (6th Cir.1984). Summary judgment is not precluded simply because the case involves allegations of employment discrimination. *Id.* at 173.

For purposes of analysis, plaintiff's discrimination claims can best be divided into three parts: (1) that her termination on March 8, 1991 was, at least in substantial part, the result of age and/or sex discrimination; (2) that she received unequal pay during her employment with the defendant because of her age and/or sex in violation of Title VII, the ADEA, and the EPA; and (3) she was treated unfairly with regard to bonuses and promotions because of her age and/or sex in violation of Title VII, the ADEA, and the EPA. I will consider each of these claims in turn.

III.

*Plaintiff's Termination*

■ There is an established pattern for the allocation of proof in employment discrimination cases. The pattern is applicable both in Title VII actions for sex and other forms of discrimination and for age discrimination under the ADEA. According to *McDonnell–Douglas Corporation v. Greene*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. Plaintiff must establish facts, by a preponderance of the evidence, which if not explained, prove or give rise to an inference of unlawful discrimination. If the plaintiff successfully establishes a *prima facie* case, the burden is then upon the defendant to articulate a legitimate, nondiscriminatory reason or reasons for its actions. If defendant comes forward with such a reason, plaintiff may then attempt to establish that the non-discriminatory reason articulated by the defendant was a mere pretext for an alleged discriminatory action. However, the plaintiff at all times carries the ultimate burden of proving discrimination. Even though the burden of going forward with the evidence may shift between the plaintiff and the defendant, the burden of persuasion always remains with the plaintiff. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 374–75 (6th Cir.1984).

■ The court specifically acknowledged in *McDonnell–Douglas* and reiterated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that, because the facts will vary from case to case, the method of establishing the *prima facie* proof will vary to accommodate the relevant fact situation. In a termination case such as this, plaintiff may establish a *prima facie* case by establishing each of the following four elements: (1) that she was a member of a protected class; (2) that she was discharged; (3) that she was qualified for the position; and (4) that she was replaced by a person outside the class. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 580 (6th Cir.1992). However, the

court also notes that the United States Court of Appeals for the Sixth Circuit has rejected strict adherence to the *McDonnell–Douglas* criteria and has noted problems associated with the mechanistic application of it:

> A mechanical application of the *McDonnell–Douglas* guidelines might bar the suit of a worthy ADEA claimant. In other cases, an overly mechanical application could supply an ADEA plaintiff with a triable claim where none exists.

*Ackerman v. Diamond Shamrock Corporation,* 670 F.2d 66, 69 (6th Cir.1982); *see also LaGrant v. Gulf & Western Manufacturing Company, Inc.,* 748 F.2d 1087, 1090 (6th Cir.1984). Ultimately, the issue becomes whether plaintiff's age and/or sex was a determining factor in her termination. *Id.* A bare bones *prima facie* case of discrimination will not survive a motion for summary judgment. *See Wooden v. Board of Education of Jefferson County, Kentucky,* 931 F.2d 376, 379 (6th Cir.1991).

▬ Initially, the court notes that it appears that plaintiff has at least raised a *prima facie* case of sex and/or age discrimination. She is a member of both protected classes (she was 47 at the time of her termination). She was terminated. Arguably, she was qualified for her position, and she was replaced by someone outside of either protected classification (a male in his early 20's). However, I am of the opinion that this is a case where the bare assertion of a *prima facie* case cannot be allowed to permit the plaintiff to escape summary judgment. Ultimately, plaintiff has not presented any proof from which a reasonable jury could conclude that either plaintiff's age or her sex was a substantial factor in her termination.

Robert Jarvis was plaintiff's supervisor at the time of her termination. In his affidavit, he states that as part of his duties as district manager he examined the call activities of the sales representatives in plaintiff's district in October, 1990 and noticed discrepancies regarding plaintiff's call activities. This led him to begin the investigation which revealed other discrepancies and led to the surreptitious viewing of plaintiff's home on January 21, 1991 by Jarvis and another man. There is not a scintilla of evidence in the record that Jarvis began or continued in this investigation at the insistence of his superior, Mac Wright, or anyone else. Plaintiff has presented no evidence that Jarvis at any time discriminated against female or older workers. In fact, plaintiff stated in her deposition that she believed Jarvis "tried to be fair" in his dealings with her and that he did not discriminate against her. Sunstrom Deposition at pp. 144, 301. Plaintiff bears the ultimate burden of proving that she was discharged at least in part on the basis of her sex and/or age. Even her own testimony refutes her claim that sex and/or age caused her discharge:

> Q. What do you believe is the reason that you were terminated?
>
> A. I really believe that it was a setup, it was a conspiracy, because Mac Wright and Tom Halstead are very best of friends; they have been for many, many years. And I know too much ... [a]bout [Halstead's] situation, his marriage ... when we had national meetings ... [S]ome of them took their girlfriends ...
>
> Q. Anything else that you believe that you know that led to your termination?
>
> A. Just the bitterness.... Tom [Halstead] just didn't want me or—in the district or want me employed with the company.... I think it was a personal thing with him.
>
> Q. Anything else?
>
> A. No....

Sunstrom Deposition at pp. 304–05.

Plaintiff spends the majority of her response to the motion for summary judgment denying any wrongdoing with respect to her calls and record keeping and criticizing the inadequacy of Jarvis' investigation since he did not take up her offer to contact any of the physicians involved. Courts, including the United States Court of Appeals for the Sixth Circuit, have repeatedly held that plaintiff's denial of defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a discrimination claim to withstand a motion for summary judgment. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 585 (6th Cir.1992); *Irvin v. Airco Carbide,* 837 F.2d 724 (6th

Cir.1987). Even if plaintiff did not falsify the company records as charged, an employer successfully rebuts a *prima facie* case of disparate treatment by showing that it honestly believed that the employee committed the infraction. *See Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989). Even if plaintiff succeeded in proving at trial that she did not falsify her records, she still would not have succeeded in proving what she ultimately bears the burden of proving in this case—that age or sex was a substantial factor in her termination. She has submitted no evidence from which a reasonable jury could reach that conclusion. Accordingly, the defendant is entitled to summary judgment on plaintiff's claim that she was terminated as a result of sex and/or age discrimination.

## IV.

### *Plaintiff's Claim of Unequal Pay*

■ Plaintiff alleges that while she was employed by the defendant she received wages less than that of male employees performing the same job. The analysis of a claim of unequal pay for equal work is essentially the same under both the Equal Pay Act and Title VII. *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir.1981). To establish a claim of unequal pay for equal work, a plaintiff has the burden to prove that the employer "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). *See* 29 U.S.C. § 206(d)(1). Once a plaintiff has established that she has been paid unequally for equal work, "the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Id.* at 196, 94 S.Ct. at 2229. In any event, plaintiff must first establish a *prima facie* case of discriminatory compensation by proving that different wages were paid to employees of different groups for substantially equal work. *Id.* at 195–96, 94 S.Ct. at 2228–29.

■ Plaintiff has failed to come forward with any evidence which would demonstrate that she received less wages than males performing the same job because of her sex. The employee number, sex, date of hire, and base salary as of the date of plaintiff's termination for each of the sales representatives in the Greater Charleston District is set forth below:

| Employee Number | Sex | Date of Hire | Base Salary as of 3/8/91 |
|---|---|---|---|
| Sunstrom | Female | 01/05/86 | $28,680.00 |
| 39215 | Male | 10/15/90 | $27,500.00 |
| 28893 | Female | 06/20/86 | $30,320.00 |
| 31663 | Female | 09/11/87 | $26,800.00 |
| 37539 | Male | 05/03/89 | $25,930.00 |
| 37561 | Female | 05/01/89 | $28,430.00 |
| 34581 | Female | 04/25/88 | $28,715.00 |
| 39352 | Male | 11/14/90 | $26,600.00 |

Attachment # 6, Schering's Position Statement in Response to EEOC Charge # 253–92–0190. At the time of her termination, plaintiff's base salary was higher than that of any male sales representative within the Greater Charleston District. In addition, defendant has presented uncontradicted evidence that in 1989 and 1990 (plaintiff's last full year), plaintiff's yearly bonus was greater than that of any male sales representative in the Greater Charleston District. *See* Affidavit of Linda Starace.

Plaintiff alleges that a male employee hired on October 15, 1990, Charles McRae, had a base starting salary of $27,600.00. Plaintiff's base starting salary on January 5, 1986, was $16,500.00. However, reviewing the base starting salary and dates of hire of each of the Greater Charleston District sales representatives reveals that this discrepancy is the result of an inflation in starting salaries and other factors, such as perhaps education and experience, rather than sex discrimination. For example, a female, Lora Greene, hired on June 20, 1986, had a base starting salary of $27,500. Elizabeth Foust, hired on May 1, 1989, had a base starting salary of $25,500, while Matthew Arvon, hired two days later on May 3, 1989, had a base starting salary of $22,000. There is nothing in these statistics from which a reasonable jury could conclude with respect to the sale representatives in the Greater Charleston District that males were receiving higher wages for the same work than were females.

In her response to the motion for summary judgment, plaintiff identifies three male employees, David Hodges, Kevin Paschall, and Donald O'Guin, as "comparable" male employees who received higher wages than she did. However, she has not presented any evidence from which a reasonable jury could conclude that Hodges, Paschall and O'Guin were receiving higher wages for the same work as female employees performed. First, there is no evidence in the record to indicate what Hodges, Paschall and O'Guin made with respect to plaintiff for any of the years plaintiff was employed. Although plaintiff has had an opportunity to complete discovery, she has not presented anything upon which a wage differential could be found other than some vague, allegedly overheard conversations in a hallway about the percentage ranges of various employees' raises. Second, although it is not clear from the record when their promotions took place, they were in different job classifications than plaintiff for much of the relevant time period. Hodges and Paschall were classified as senior sales representatives and O'Guin was classified as a district trainer. Defendant contends that these classifications were higher rated and more highly compensated than plaintiff's and were not "comparable" positions. Plaintiff has presented no evidence to demonstrate that they were comparable positions. Third, these three identified males were not in the same sales district as plaintiff, so comparing them is of questionable value. In addition, the performance ratings of Hodges, Paschall and O'Guin were all considerably higher than those of plaintiff, and salary increases and yearly bonuses were tied to those performance ratings. Plaintiff's own deposition testimony negates an inference that annual raises were based on sex. Plaintiff testified that her fellow sales representatives, both men and women, felt that Hodges, O'Guin and Paschall received higher raises because of a "favored" status. Plaintiff testified:

Q. But both men and women felt that those were the favored few; right?

A. Yes.

Q. And both men and women felt that they were getting increases because—over and above what most people were getting because they were the favored few; correct?

A. Yes.

Sunstrom Deposition at pp. 287–88.

Plaintiff argues that the performance reviews of Hodges, Paschall and O'Guin were subjective, which could allow some discrimination in their application. However, apparently not all of the reviews were based on wholly subjective criteria. For example, Hodges' outstanding review in 1992 revealed that cumulative sales results of the products he sold ranked him 14th out of 383 of the sales representatives. Plaintiff has presented no evidence from which a reasonable jury could conclude that the performance ratings, upon which some salary increases were based, were the result of any sex or age discrimination. As plaintiff testified in her deposition, those who received less favorable reviews, and therefore less in the amount of salary increases, both male and female, felt that O'Guin, Paschall and Hodges had a "favored status." The fact that all three were males does not raise an inference of sex discrimination, particularly in light of the fact that there were other males not receiving this favored status.

The court finds nothing upon which a jury could conclude that plaintiff received less salary or lesser salary increases based on the fact that she was a woman or because of her age.

## V.

### *Plaintiff's Claim With Regard to Bonuses and Promotions*

The timely filing of a charge with the EEOC is a prerequisite to the bringing of an action under the ADEA or Title VII. *EEOC v. Bailey Company*, 563 F.2d 439 (6th Cir.1977). The filing of the charge triggers the statutory procedure of investigation and conciliation by the EEOC. *Id.* With this in mind, the rule in this circuit is that "the scope of the judicial complaint is 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Id.,* at 446. This court cannot review claims regarding policies and practices that are beyond the scope of the

EEOC charge. *See Combs v. C.A.R.E., Inc.,* 617 F.Supp. 1011 (E.D.Ark.1985).

■ The EEOC charge filed by plaintiff addressed chiefly her March 8, 1991 discharge. It also made a general claim that during her employment she received less wages than those of male employees doing the same job. There is no mention in the charge itself of any denial of promotions or bonuses based on her sex or age. The EEOC complaint states that the "date discrimination took place" was March 8, 1991. The form completed by plaintiff contains a box for "continuing action", which was not checked. I conclude that the allegations with regard to bonus payments and promotions do not reasonably fall within the scope of the investigation which would be triggered by the allegations in the charge, nor is there any evidence that they were considered. Accordingly, those claims are not properly before the court and must be dismissed. *See Bailey,* 563 F.2d 439.

Plaintiff claims that she did properly present these claims to the EEOC, in a portion of an 11–page affidavit which she apparently attached to her complaint. Those allegations are related to the statements which her then district manager Jeff Jordan allegedly made to her in July, 1989. They are set out on Page 1267 above. Essentially, plaintiff claims that Jordan told her that Paschall, Hodges and O'Guin made more money and received higher performance bonuses because they were married with wives and children, and she was a single, divorced woman. Plaintiff also alleged that Jordan told her that she could not be considered for any promotion or sales trainer jobs because those jobs would have to be given to O'Guin, Patrick White, David Hodges or Kevin Paschall, and those were jobs for men, not women.

With respect to performance bonuses, it is uncontradicted that prior to December, 1989, defendant had a discretionary bonus program under which district managers had discretion to award varying amounts of bonuses from a pool. Plaintiff and others felt that Hodges, Paschall and O'Guin were getting disproportionately large amounts of those discretionary bonuses. However, plaintiff has not been able to produce any evidence indicating what the amounts of the bonus pools were or what amounts any of these three "favored" individuals were getting. In December, 1989, the company eliminated the discretionary bonus program in its entirety, apparently because it was felt that it was being applied unfairly. Even if plaintiff had properly raised her claims about this discretionary bonus pool before the EEOC when she filed her charge on December 7, 1991, her claim with respect to a program that ended in December, 1989 would clearly have been time-barred. *See* 42 U.S.C. § 2000e-5(e). The court notes again that on the EEOC charge plaintiff did not check the box with respect to a "continuing" violation, nor has she raised in her memoranda any "continuing violation" theory. Accordingly, plaintiff has not properly presented nor timely raised her claims with regard to discriminatory practices in the discretionary bonus pool which was abolished in December, 1989.

With respect to plaintiff's claim of a denial of promotions, she again failed to raise it in her EEOC charge, and that claim is not properly before the court. In addition, the only allegation she makes with respect to a promotion is on Page 7 of the affidavit attached to the EEOC charge in which she claimed that in July, 1989 Jeff Jordan told her that she could not be considered for any promotion or sales trainer job and that those jobs were for men. Any claim she has arising from this alleged July, 1989 conversation is also time-barred. *See* 42 U.S.C. § 2000e-5(e). The only promotion which plaintiff contends she ever applied for and was denied was a sales trainer position which was created in the Greater Charleston Sales District when it was formed in August, 1990. That position was filled by a female, Judy Molina. Thus, plaintiff obviously does not have a sex discrimination claim based on this promotion. Plaintiff has submitted nothing indicating what Ms. Molina's age is, nor alleged that Ms. Molina's selection was the result of age discrimination. Simply, plaintiff has presented no evidence from which a jury could reasonably conclude that she was ever denied a promotion because of her age or sex.

VI.

*Conclusion*

In light of the foregoing, defendant Schering–Plough Corporation, Key Pharmaceuticals Division, is entitled to summary judgment and this action will be dismissed.

Order accordingly.

### *ORDER*

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that the motion for summary judgment of defendant Schering–Plough Corporation, Key Pharmaceuticals Division, [Court File # 17] is GRANTED and this action is DISMISSED. Defendant's motion to strike and for partial summary judgment [Court File # 7] is DENIED AS MOOT.