Carolayn **LAURO**

v.

**TOMKATS, INC.**

No. 3:97–0204.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 18, 1998.

James L. Harris, Nashville, TN, for Plaintiff.

Kenneth A. Weber, Baker, Donelson, Bearman, Caldwell, Nashville, TN, for Defendant.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Pending before the Court are two Motions for Summary Judgment by the Defendant. In the first Motion, the Defendant has asked for summary judgment on the Plaintiff's claims, (Doc. No. 10), and in the second, the Defendant has asked for partial summary judgment on its cross-claims. (Doc. No. 13.) For the reasons expressed below, the Court hereby grants the Motion for Summary Judgment on the sexual harassment claims in part and denies it in part. The Court further denies the Defendant's Motion for Summary Judgment on its Privacy Act counterclaim, but grants summary judgment *sua sponte* in favor of the Plaintiff with respect to this claim.

## I. BACKGROUND

The Plaintiff has brought this action pursuant to Title VII of the Civil Rights Act of 1964, § 42 U.S.C. § 2000e, and the Tennessee Human Rights Act, Tenn.Code Ann. 4–21–101 *et seq.*, alleging that she was sexually harassed in her place of employment, Tomkats, Inc. ("Tomkats"). The Complaint alleges harassment by the Plaintiff's co-workers and supervisors. Tomkats has counterclaimed against Lauro based on the California Invasion of Privacy Act ("Privacy Act"), California Penal Code § 630 *et seq.*, and common law fraud. The Defendant has moved for summary judgment in its favor on the Plaintiff's claims, as well as for summary judgment on its Privacy Act counterclaim.

The Plaintiff was employed by Tomkats, a catering service which among other things, caters food on-location for movie crews, since November of 1995. (Compl.¶ 4.) In this capacity, Lauro worked in the movie set of the films "Gone Fishin'" from November 6, 1995 through December 21, 1995; "The Preacher's Wife" from January 8, 1996 through March 25, 1996; "One Fine Day" from April 1, 1996 through May 17, 1996; and "Winnamucka," which was later re-named "Trial and Error" from May 28, 1996 through August 15, 1996. (Statement of Uncontroverted Facts [Doc. No. 20] ¶ 1; Morales Dep. 34–38.) Lauro claims that throughout the filming of "Gone Fishin'," the men on the catering crew made sexually offensive remarks about women: "they just has an attitude that women shouldn't be in the kitchen on a—on a set,

and they made that clear." (Lauro Dep. at 31.) Furthermore, she alleges that at one point during the filming of "Gone Fishin"' owner Tom Morales told her about how he likes to have affairs, suggesting that he may want to have an affair with her. She claims that this kind of attitude continued on the set of "The Preacher's Wife," and that when Morales visited the set, he touched her in a sexually offensive way, for example, rubbed her shoulders and said "do you know why I go after you." (Lauro Dep. at 35.) At one point, Lauro claims that when she asked Morales about a raise, he replied, "Why don't you get on your knees and show me how bad you want a raise?" (Lauro Dep. at 34.) In addition, during the filming of "One Fine Day," Lauro claims that Emil Muscola, a fellow crew member, would refer to the Plaintiff as "babe," and to other women as "dykes" or "prostitutes." Lauro alleges that the most serious harassment, however, occurred during the filming of "Winnamucka" in the summer of 1996. Throughout the filming of that movie, Lauro claims that Dirk Long, the crew leader, at one point hosed her down, and on several occasions slapped her buttocks and said to her, "I love you baby," and "I want to marry you." (Lauro Dep. at 53, 72.) Dirk Long would also on a daily basis allegedly make comments to her such as, "Come on baby let's go into the walk-in," and "You've got a fine ass body, why don't you give it up to me, give me some love, come & give me a blow job in the walk-in[.] Amy did when she worked with me." (Id. Ex. 2 Addendum.) She further claims that Jim LeClaire, the chef on the set, made sexually hostile remarks towards her, specifically that he would scream at her such obscenities as "You stupid motherfucker, you dumb bitch, you lazy fuckin' whore," throughout the day, on a daily basis. (Lauro Dep. Ex. 2 Question 6 & Addendum.) Lauro also alleges that when LeClaire discovered that she had asked the crew leader to speak to him about his language, he threatened to do violence to her, saying: "I'll talk to you any way I fuckin' want to.... Go call Tom & Annett (sic) ... and I'll punch your fuckin' face in." (Id. at 52 & Ex. 2 Question 6.) On August 5, 1996, LeClaire also left Lauro stranded on the set, which was about an hour away from her hotel room, saying to her before he left "I'm leaving your ass here you stupid bitch, you can fuckin' walk home." (Id. Ex. 2 Addendum.) Lauro further alleges that Brian Thomas, a fellow employee, threatened her on several occasions. One time, Thomas, believing that Lauro had seen him in the possession of cocaine, said to her, "Girl you better not be telling people I'm I(sic) fuckin' drug addict because I'll fuckin' beat you to death you'll be sorry." (Id.) On another occasion, Thomas was upset at the manner in which Lauro was cleaning up and shouted at her, "I'll fuckin' beat the living shit out of you—I'll fuckin' kill you—I have hit bitches befor (sic) & I would love to hit you!" (Id.) Thomas also allegedly made sexual comments towards Lauro, for example on several occasions he said, referring to the strap of his apron which hung to his knees, "This is a chin strap baby—why don't you use it on me!" (Id.)

It appears that Lauro was most disturbed about LeClaire's conduct, and that she reported LeClaire's abusive language to Long, the crew leader, and to Frank Wilson. (Id.) Specifically, it appears that on July 14, 1996, Lauro had a meeting with Jim LeClaire and Frank Wilson, during which time she asked LeClaire to treat her and the rest of the crew with respect. LeClaire allegedly responded only by saying, "Fuck that." (Id.) Lauro purportedly spoke to Long and Wilson on several other occasions about LeClaire's conduct, but LeClaire was recalcitrant and would reply, "What you guys (sic) have to pat her pussy—fuck that bitch—fuck that whore[.] I'll speak to her whatever way I want to (sic)." (Id.) Lauro alleges that Long "would talk to them, but it never changed anything. I don't think they respected Dirk that much." (Lauro Dep. at 64.)

In addition, Lauro spoke with her mother about these incidents, who suggested that she report these incidents to Tom Morales. Lauro claims that she feared discussing these incidents with Morales because her sister, who also worked for Tomkats, had previously approached him with problems that she had on the set and he had ineffectively dealt with them. Lauro understood that when her sister reported these inci-

dents, Morales repeated the complaints to the alleged instigators and "made the situation worse for her." (*Id.* at 64.) Lauro did eventually attempt to speak with Morales about the harassment when he came to visit the set of "Winnamucka" for a period of three days. Lauro approached Morales during her lunch shift, told him that she needed to speak to him, and asked him not to go to "the guys on the crew" to inquire as to her reasons for wanting to speak to him. (*Id.* at 79.) However, Lauro claims that Morales avoided her, sometimes claiming that he was busy and on one occasion excusing himself on the basis that he "felt too hung over and didn't want to discuss anything with" her. (*Id.*) In his deposition, Morales acknowledged that Lauro did make an attempt to talk to him when he arrived on the "Winnamucka" set, but that when he inquired further, she stated that she could not talk to him at that time because she was in the middle of her lunch shift. (Morales Dep. at 48.) Morales, believing that Lauro wanted to ask him about a raise, sought out Long and asked him if he knew what Lauro wanted to talk to him about. (*Id.*) Morales also concurred that Lauro asked to speak to him repeatedly during his visit, but alleges that he was busy, and thus unable to meet with her. (*Id.*) He also admitted saying to Lauro at one point that he was "too hung over" to speak to her, but believed that he might have been referring to his condition after the long flight to Los Angeles. (*Id.* at 49.)

Prompted by the incident where she was left stranded on the set, on August 5, 1996 Lauro telephoned Morales at his office in Los Angeles and spoke with Annette McGraw, the production coordinator, regarding the harassment she experienced. (Lauro Dep. at 75.) McGraw indicated that she and Morales would "get this straightened out," and that Morales would call her later that evening. (*Id.* at 76.) After Morales spoke with Lauro, he telephoned Long and asked him about his knowledge of the incidents. (Morales Dep. at 55.) Morales then spoke with LeClaire, and directed him to return to Nashville on the next flight out. (*Id.* at 56.) Morales met with LeClaire the following week, suspended him, and suggested that he receive counseling. (*Id.* at 56–57.) Morales re-hired Le-

Claire into a reduced salary position six months later, after he had obtained a letter from LeClaire's counselor stating that he was ready to return to work. (*Id.* at 57.) Lauro was notified late in the evening on August 5th that disciplinary action had been taken against LeClaire. (Lauro Dep. at 77.) Although Lauro asserts that in her conversation with Morales she related to him all of the crew member's harassing conduct (Lauro Dep. at 88), Morales claims that he was not aware of Dirk Long's participation in the harassment until he learned of Lauro's charge with the EEOC, at which point he demoted Long from his position as a crew leader. Lauro asserts that the sexually harassing behavior stopped temporarily after LeClaire was removed from the "Winnamucka" set, but that Frank Wilson continued to threaten her. (*Id.* at 87–88.)

It appears that sometime during the filming of "Winnamucka" Lauro contacted her present attorney and obtained advice about filing a sexual harassment complaint with the EEOC. At about the same time, Lauro began tape recording conversations between herself and her alleged harassers.

After the shooting of "Winnamucka" was completed, Lauro met with Morales and was asked about her intent to pursue a culinary degree. She was thereafter denied a position in the catering crew of two films that were scheduled in the following months. Morales claims that his decision was based on Lauro's admission that she did not intend to attend culinary school, and also on the fact that she had received low evaluations from her supervisors. (Morales Dep. at 36, 39, 44.)

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment is proper if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *Anderson v. Liberty*

*Lobby, Inc.* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the non-movant may not rely solely on conclusory allegations, but rather must come forward with affirmative evidence which establishes its claims and raises an issue of genuine material fact. *Id.* at 324, 106 S.Ct. 2548. The court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. *Scope of EEOC Charge*

■ First, Tomkats claim that Lauro should be estopped from alleging acts of harassment that she did not include in her EEOC Charge of Discrimination. The EEOC charge includes only those acts that occurred on the set of the "Winnamucka," and identifies the "date of first occurrence" as June 17, 1996. Since the filming of "Winnamucka" began on May 28, 1996, Tomkats asserts that any alleged harassment that occurred before the filming of "Winnamucka" is not properly before this Court. The rule in the Sixth Circuit is that "the scope of the judicial complaint [in Title VII actions] is 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Sunstrom v. Schering–Plough Corp.*, 856 F.Supp. 1265, 1273 (E.D.Tenn.1994) (quoting *EEOC v. Bailey Co. Inc.*, 563 F.2d 439 (6th Cir.1977)). This has been interpreted by the Sixth Circuit to mean that instances of discrimination that were not specifically charged in the EEOC statement could not be pursued in the ensuing federal action. *See Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir.1986).

■ Courts employ a broad reading of an EEOC charge when the charging party is proceeding without counsel, as Title VII is a remedial statute and most "claimants are unschooled in the technicalities of the law." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir.1991). However, "liberal construction is not necessary where the claimant is aided by counsel in preparing his [or her] charge." *Id.* The Defendant notes that in her EEOC charge, Lauro lists attorney James L. Harris as a person from whom she sought assistance with respect to her discrimination claim (*see* Lauro Dep. [Def's Ex. 1] Ex. 2), and argues that since she was assisted by counsel, her charge does not merit broad construction. Lauro disputes that she was assisted by counsel in filling out her EEOC charge, claiming that counsel only aided her in giving her a copy of the EEOC charge form, which she completed herself. The Court credits Lauro's assertion that she prepared her EEOC charge herself, as she wrote in the first charge form submitted to the EEOC only that Harris "recommended and connected me with your agency," and not that the form was completed by Harris. (*Id.*) This statement is further corroborated by a letter which Harris wrote to the EEOC, wherein he asks that the agency send directly to Lauro copies of the forms necessary to file an EEOC charge. (Def's Ex. 8.) Furthermore, this first charge form is partly handwritten and contains handwritten corrections, which would indicate that it was not professionally prepared. All three charge forms do, however, contain citations to federal statutes, an indication that counsel may have been more than marginally involved in filing the EEOC charge. Nevertheless, since aside from this last fact the record does not contain any evidence that anyone other than Lauro prepared these forms, the Court will assume that Lauro acted completely on her own.

■ Even construing Lauro's charge liberally, however, the Court concludes that Lauro may not pursue instances of discrimination that occurred prior to June 17, 1996, the date that she listed as pertaining to the first instance of discrimination in all *three* charges that she submitted before the EEOC. (*See* Lauro Dep. Ex. 6–8.) It would appear that if Lauro had intended to pursue earlier instances of discrimination in her charge, she would have listed an earlier date

on at least one of the two amended charges she submitted to the EEOC. The EEOC charge form contains a space which asks for the earliest and the latest date in which discrimination took place, and immediately below contains a box which can be marked to indicate a "continuing violation." The form is clearly written and plainly alerts lay complainants that the date of the earliest instance of discrimination charged should be indicated. It is also evident that Lauro had reconsidered the listed dates of discrimination in both the second and third charges she submitted to the EEOC, for two reasons. First, Lauro changed the date listed as the "latest date of discrimination" on these two charges, but kept the same "earliest date of discrimination." Second, in the third complaint, Lauro placed a check in the box which indicates a "continuing violation." This also implies that she reconsidered the period of discrimination, as this box had been left blank in her first two charges.

The Court does not agree with the Plaintiff that the fact that she included in her charges that she was being harassed "all the time" indicates that she intended to expand the scope of her EEOC charge to include instances of discrimination prior to June 17, 1996. While the phrase "all the time" can denote duration, it can also be used to indicate frequency of attacks. The Court cannot conclude from the use of this phrase alone that Lauro intended to expand the scope of her charge, particularly since there is no indication that any of the instances of discrimination that she described in her EEOC charges occurred prior to June 17, 1998. More likely, Lauro's use of the phrase "all the time" in her charges was meant to capture the frequency in which she experienced the harassment.

Finally, Lauro notes that one of the purposes of the requirement that a litigant first file an EEOC charge before proceeding in federal court is to trigger the investigatory and conciliatory procedures of the EEOC. Thus, Lauro asserts that since the scope of the federal action is more intimately tied to the extent of the EEOC investigation as opposed to what was charged in the EEOC complaint, she should be allowed to pursue instances of harassment that occurred prior to June 17, 1996. *See generally Bailey,* 563 F.2d at 446–47. However, the Sixth Circuit has previously held that even where a plaintiff contends that past instances of discrimination were part of a related course of conduct, the plaintiff must specifically include those past instances in the EEOC charge in order to assert claims based on them in federal court. *See Vinson,* 806 F.2d at 688; *Sunstrom,* 856 F.Supp. at 1274 (in unequal pay claim, allegations relating to bonus payments and promotions which occurred prior to the date alleged as the "date discrimination took place" outside scope of the EEOC charge).

Consequently, the Court concludes that Lauro only intended to pursue claims of discrimination that occurred after June 17, 1996, but that she also wished to charge that from that date on, the discrimination was continuing. However, even though Lauro may not state a cause of action for acts of discrimination that took place before June 17, 1996, she may use prior instances of discrimination as "background evidence" to prove her properly-charged claims. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

### 2. *Hostile Work Environment*

■ Title VII of the Civil Rights Act of 1964 prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ..." 42 U.S.C. § 2000e–2(a)(1).[1] It is well-settled that sexual harassment falls within the definition of proscribed sex discrimination. *Meritor Sav. Bank, FSB v. Vinson,*

---

1. The analogous portion of the Tennessee Human Rights Act, Tenn.Code Ann. § 4–21–401(a)(1) (THRA), includes language identical to Title VII, stating that it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's ...

sex ...." Since the purpose of the state statute is to effectuate the federal civil rights laws within Tennessee, the analysis used for the Plaintiff's Title VII claim is the same for the THRA. *See Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 31 (Tenn.1996).

477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Two general categories of sexual harassment have been recognized by the courts: *quid pro quo*, in which tangible job benefits are conditioned upon compliance with certain sexual demands, and hostile environment, in which sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Id.* at 65, 106 S.Ct. 2399. Only hostile environment sexual harassment is alleged in this case.

■ In order to succeed on a hostile environment claim, a plaintiff must prove the following elements:

(1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment . . . ; and (5) there exists respondeat superior liability.

*Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir.1996) (quoting *Rabidue v. Osceola Refining, Co.*, 805 F.2d 611, 619–20 (6th Cir. 1986)).

### a. Was Harassment Based on Sex?

■ Tomkats first argues that the third prong of the test has not been met. In order to prove a sexual harassment claim, the plaintiff must show that she would not have been a target but for her gender. *Rabidue*, 805 F.2d at 620. Tomkats asserts that the atmosphere in which Plaintiff worked was not harassing in a sexual sense, because, as Lauro herself admitted, the working environment was abusive in general. Tomkats points out that sexual comments were not only directed at Lauro, but at women in general, and that foul language was used by the entire crew, including Lauro. In fact, in her EEOC charge, Lauro refers to an instance in which, in response to one of LeClaire's abusive comments, Lauro said "'Fuck you Jim' in a calm manner and walked away.'" (Lauro Dep. Ex. 2 Question 6.) Lauro also admits that after she was

hosed down by LeClaire and Long, "I in turn waited until all 4 men went inside are (sic) walk-in refrigerator to smoke pot like they did every afternoon after lunch and hosed them all down. They in turn chased me threatening to beat me up." (Lauro Dep. Ex. 2.) Tomkats also points to portions of the transcripts of the tape recordings made by Lauro wherein she uses foul language, and to her deposition testimony, where she admits to using vulgar language on occasion. (Mem. Supp. Mot. Dismiss [Doc. No. 11] at 18; Lauro Dep. at 46–48.) Thus, Tomkats contends that the verbal abuse was not limited to women, or directed specifically towards women, and therefore Lauro's claims are not actionable because Title VII does not protect against a generally abusive working environment. *See Rabidue*, 805 F.2d at 620 ("instances of complained of sexual conduct that prove equally offensive to male and female workers would not support a Title VII sexual harassment charge because both men and women were accorded like treatment").

The Court disagrees that Lauro's allegations, viewed in the best possible light, do not prove that she was subjected to a sexually hostile work environment. Lauro reports that she was frequently called gender-specific names and obscenities, such as "babe," "dyke," "prostitute," "bitch," and "whore," by several of the crew members. Furthermore, Morales, Long, and LeClaire made frequent and inappropriate sexually-suggestive comments to her, and Long touched her inappropriately. Lauro alleges that these incidents occurred with frequency and on a daily basis. She further asserts that LeClaire's verbal abuse was directed mostly at women, and not at the crew in general. (Lauro Dep. at 59.) Though it appears that many of the Tomkats crew members regularly spoke obscenities, Lauro's allegations of an environment pervasive with sexually crude comments, offensive touching, and repeated jokes wherein crew members suggested that Lauro perform sexual acts on them, present a triable issue of fact as to whether Lauro was subjected to this behavior solely because she is a woman.

■ Tomkat's contention that Lauro was not subject to a sexually hostile environment because she herself used crude language ap-

pears to invoke the second prong of the test to determine whether sexual harassment has occurred, namely that the harassment was not unwelcome. However, the fact that Lauro might have willingly participated in the use of foul language does not foreclose the possibility that the harassment of which she complains was unwelcome. To so conclude would be to assume that as a result of Lauro's occasional use of foul language, she would as a matter of law have approved of the sexually explicit and offensive comments to which she was subjected. The Court declines to make such a formulaic and unsubstantiated inference. *See Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir.1987) (concluding that it was error for trial judge to conclude that plaintiff who used foul language and sexual innuendo was by definition the kind of person who would not be offended by sexually offensive comments); *Meritor Sav. Bank*, 477 U.S. at 68, 106 S.Ct. 2399 (plaintiff's voluntary participation in sexual relationship did not make sexual advances welcome). In fact, the record shows that Lauro did find her alleged harassers' conduct to be unwelcome—Lauro testified numerous times in her deposition and in the charge she filed with the EEOC that she was disturbed by the male crewmembers' behavior and related this to both the perpetrators and to supervisory personnel.

Furthermore, in at least two of the documented instances where Lauro resorted to using foul language or joined in horseplay, she appears to be reacting to abusive comments directed towards her. If this was indeed the reason for her use of foul language (Lauro asserts in her deposition that she was not in the habit of using foul language [Lauro Dep. at 46–47] ), Lauro should not be faulted for her method of reacting to and coping with her situation. Lauro's avenues for escape were particularly limited since she was on location and constantly in the presence of her alleged harassers. Accordingly, the Court concludes that there is a disputed issue of fact as to whether Lauro was subjected to a hostile environment because of her sex.

### b. *Was the Environment Objectively Hostile?*

In order to prove a hostile work environment, a plaintiff must show that the harassment is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." ' *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). Tomkats argues that the sexual harassment of which Lauro complains was not "severe or pervasive enough" to establish an objectively hostile work environment. In support of this proposition, Tomkats cites specifically to two cases. First, Tomkats directs the Court to *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.1997), *cert. denied*, —— U.S. ——, ——, ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997), where the Sixth Circuit overturned a jury finding of sexual harassment where the following comments were made in front of the plaintiff: (1) a co-worker said, "Nothing I like more in the morning than sticky buns," while looking plaintiff up and down, smiling, and wriggling his eyebrows; (2) making a reference to "Hootersville," "Tisville," or "Twin Peaks," in regard to a piece of land; (3) a comment that plaintiff was "paid great money for a woman;" (4) a reference to plaintiff dancing on the tables at a biker bar; and (5) a comment that an employee should "Just get the broad to sign it." *Id.* at 823–24. The Sixth Circuit determined that although the aforementioned comments were "sex-based, ... the evidence [was] insufficient to support a finding that they were severe or pervasive enough to create an objectively hostile work environment." *Id.* at 826. Second, Tomkats cites to the unpublished Sixth Circuit case of *Walk v. Rubbermaid Inc.*, 76 F.3d 380, 1996 WL 56203 (6th Cir. Feb.8, 1996). *Walk* involved a supervisor who frequently used foul and abusive language against a female subordinate. Despite the allegations of general abuse, the Court held that the Plaintiff had not proven that she had been harassed because of her sex, given that the only sex-based comment made by the supervisor was that he did not have time for "you or your fucking menopausal bitches," and that this

comment was made at most three times. *Walk*, 1996 WL 56203, at *2.

The Supreme Court has set forth several factors that are relevant in determining whether a sexually hostile environment is present. These factors include:

[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), *cited in Black*, 104 F.3d at 826. The harassment alleged by Lauro is decidedly more severe and prevalent than that described in both the *Black* and *Walk* cases, and, as discussed above, was frequent, severe, threatening, humiliating, and interfered with her work performance, as required by *Harris*. In *Black*, the Court supported its holding on the basis that most of the comments the plaintiff overheard were not directed at her, and that only verbal conduct was alleged. In contrast, Lauro alleges offensive touching, and verbal attacks that were not only directed at her but were abusive and threatening as well. Lauro even asserts that she was threatened with physical violence if she reported the harassment to Morales. (Lauro Dep. at 65.) Furthermore, the present case is distinct from *Walk*, as this was not an isolated instance of sexual harassment, but conduct that persisted with frequency throughout Lauro's employment on the "Winnamucka" set. Finally, with respect to the effect on Lauro's work performance on the Winnamucka set, Lauro alleges that she was "completely humiliated and intimidated by these men," such that she was hesitant to work for another catering company after her employment with Tomkats. (*Id.* at 149.) She also alleges that she was "sick for six weeks from the stress" to which she had been subjected on the "Winnamucka" set and

had to apply for unemployment benefits. (*Id .* at 131.) The record thus reflects that the harassment that Lauro allegedly experienced was sexually motivated and created an "intimidating, hostile, or offensive working environment" that seriously affected Lauro's physical well-being. *Rabidue*, 805 F.2d at 623.

### c. *Does Respondent Superior Liability Exist?*

██ Finally, Tomkats alleges that Morales responded swiftly to Lauro's complaints, once they were brought to his attention, and thus is not liable for the actions of his supervisors or employees.

██ Since Lauro alleges harassment by both co-workers and supervisors, the Court must address the differing standards for liability against both of these categories of individuals. It has been established that when harassment is alleged against a supervisor, the employer is liable for the supervisor's conduct regardless of whether the employer was aware of it. The supervisor is deemed to have acted as the employer's alter-ego, or agent. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994). Liability attaches if "the supervisor's harassing actions were foreseeable or fell within the scope of his employment . and ... [if the employer did not] respond[ ] adequately and effectively to negate liability." *Id.* However, when the harasser is a co-worker, the employer is only responsible for the harasser's actions if the employer "knew or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." *Id.* at 804 (quoting 29 C.F.R. § 1604.11(d)). In a co-worker harassment case where the employer does take prompt corrective action, the employer can be liable "only if its response manifests indifference or unreasonableness;" mere negligence is not enough. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir.1997), *cert. denied*, —— U.S. ——, ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998). A plaintiff's burden of proving this element has been referred to as establishing *respondeat superior* liability, although an employer's liability for employee sexual harassment is direct, not

derivative as the term *respondeat superior* implies. *See id.* at 872.

Tomkats notes that once Morales was notified of Lauro's allegations of sexual harassment, he took immediate corrective action, removing LeClaire from the Winnamucka set the following day, and forcing him to go to counseling before re-hiring him. Lauro was apprised of Morales' actions the day after she spoke with him about the harassment. Morales claims that he was not at that point aware that Long was also involved in the harassing behavior, but after he was notified of Long's conduct through Lauro's EEOC charge, he demoted Long from his position as crew leader.

It is clear from the record that Morales became aware at one point of the harassment, and thus the Court need not discuss the issue of whether he was or should have been aware of his employee's conduct. However, although Morales did in fact take some corrective action, the Court finds that there is a disputed issue of material fact as to whether the action manifests "indifference or unreasonableness." *Id.* at 873. First, although Morales maintains that in the first phone conversation with Lauro, she only spoke about LeClaire's conduct, Lauro contends that she had in fact spoken with him about *all* the instances of harassment. If Morales did know about the harassing conduct of Long and Wilson, the fact that he left these two men on the set poses a triable issue of whether this response was indifferent or unreasonable, particularly since Wilson had allegedly threatened Lauro with physical harm. Furthermore, Lauro alleges that she first went to Long, her crew leader, with her complaints, but that Long was ineffective in putting an end to the harassment. Long's ineffectiveness appears to be a result of his failure to follow company policy with respect to complaints of sexual harassment. Company policy states that if an employee feels that he or she is "being harassed by any other associate based upon your ... sex, ... you should at once make your feelings known to your immediate teamleader. Your teamleader will promptly notify an officer of the Company, who will see to it that the matter is investigated, and, where appropriate, disciplinary action taken." (Lauro Dep. Ex. 1.) It is undisputed that Long did not notify Morales of the harassment, and thus failed to promptly respond to Lauro's complaints— permitting her continued exposure to the harassing conduct. This fact also presents a triable issue as to whether Tomkats took prompt and corrective action with respect to Lauro's complaints. Finally, the Court would be remiss in not mentioning Morales' own possible culpability in promoting the harassing environment at Tomkats. Lauro alleges that Morales himself touched her in a sexually offensive manner and made sexually explicit comments. Thus, Morales may have explicitly condoned the kind of environment to which Lauro was subjected, and thus fostered the harassment, regardless of any corrective action that he may have taken. Lauro herself asserts that she was reluctant to notify Morales of her situation because he had been ineffective in the past in dealing with some of her sister's complaints about the workplace.

### d. *Retaliation Claim*

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to make out a *prima facie* case of retaliation under this provision, a plaintiff must show that "(1) [s]he was engaged in activity protected under Title VII; (2)[s]he was the subject of an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action existed." *Johnson v. U.S. Department of Health & Human Servs.*, 30 F.3d 45, 47 (6th Cir.1994).

A retaliation claim is treated like a disparate treatment case, and follows the same burden-shifting framework. *Id.* Consequently, once the *prima facie* claim of retaliation is made out by the plaintiff, the burden shifts to

the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant carries this burden, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination. *Id.* The Supreme Court in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) made clear that "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519, 113 S.Ct. 2742. It should be noted that because direct evidence of discriminatory motive is rarely available, the same evidence which aids in building the *prima facie* case may also be considered at the pretext stage. *Trentham v. K–Mart Corp.*, 806 F.Supp. 692 (E.D.Tenn. 1991), *aff'd*, 952 F.2d 403 (6th Cir.1992).

▮ The Court concludes that the Plaintiff has successfully proven her *prima facie* case. It is undisputed that Lauro was engaged in activities protected by Title VII—specifically, she complained to her employer about sexual harassment and she filed a charge of discrimination against Tomkats before the EEOC. Furthermore, it is clear that she was the subject of an adverse employment action, as she was denied assignment to two movies subsequent to the filing of the EEOC charge, one starting in Nashville in September, and the other starting in October in Boston. (Lauro Dep. Ex. 7.) Finally, as discussed below, the Court finds that there is a disputed issue of material fact as to whether there is a causal link between the adverse employment action and Lauro's exercise of her Title VII rights.

▮ Lauro submits that Annette McGraw had assured her that after "Winnamucka," she would be working on a movie in Nashville for the month of September. However, after she returned to Nashville, she was informed that someone else had been hired in her place. She claims that she thereafter called McGraw twice a week to inquire as to whether there was any other work available, but was told that it was a "slow" time. McGraw indicated to her during the second

week of September that there was a movie starting in Boston in October and that she wanted Lauro to be placed on the crew. However, McGraw later informed Lauro that she could not work on that set because Dirk Long was scheduled to be the crew leader, and Tomkats had just received the EEOC complaint implicating Long in the alleged harassment. (Lauro Dep. Ex. 7.) The Court notes that while Lauro's testimony relating to McGraw's statements are hearsay, these statements are admissible under the exception incorporated in Federal Rule of Evidence Rule 801(d)(2). This rule expressly permits the introduction of hearsay admissions by a party-opponent, which includes statements "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D); *see also Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir.1986) ("[A] statement of an agent or employee may be admissible against the principal ... but a proper foundation must be made" to show that the statement was made "within the scope of his agency or employment."). McGraw's statement would thus be admissible, as McGraw appears to have been empowered by Morales to make decisions concerning the composition of crews for catering engagements, and that it was in this capacity that she made these statements to Lauro.

Taken as true, McGraw's statements establish a causal connection between Tomkats' decision to deny her a position in the Boston catering crew and the fact that Lauro filed an EEOC charge against Tomkats. Lauro's allegation that McGraw did not include her in the Boston crew because Lauro had just filed an EEOC charge implicating Long is direct proof that Lauro's filing of the EEOC charge was the cause of the adverse employment action taken against her.

▮ After it has been determined that the plaintiff has made a *prima facie* case, the court must then consider whether the employer can articulate a legitimate business reason for the adverse employment action. The record reflects that after Lauro returned to Nashville from the "Winnamucka" set, Morales, Lauro, and Lauro's mother met and

discussed Lauro's future at Tomkats. (Resp. Statement Uncontroverted Facts [Doc. No. 25] ¶¶ 2–3.) During this meeting, Morales specifically inquired as to Lauro's interest in pursuing a culinary degree in order to determine whether Lauro was qualified for long-term employment with Tomkats. (*Id.* ¶ 4.) Morales believed that an employee's culinary skills were the primary consideration in making this determination. (*Id.* ¶ 5.) During that meeting, Lauro expressed that she ·did not have any culinary training and had no interest in acquiring any. (*Id.* ¶ 6.) Morales alleges that he considered Lauro's unwillingness to obtain a culinary degree, and the fact that each of Lauro's crewleaders had complained of Lauro's work performance and asked that she not be assigned to their crew in the future. Based on these two factors, he determined that he did not want to continue investing in her. (*Id.* ¶¶ 7–10; Morales Dep. at 52.) Morales further alleges that Lauro did not get assigned to the crew for the Nashville film because since the film was "on the same location the entire time it was filming, ... we did not need a set-up person because you'd [only] set up one time." (Morales Dep. at 51.) However, as to this last point, the Court notes that Morales later admits that some set-up and preparation persons were hired for the Nashville catering crew, and that Lauro was qualified to perform such work. (*Id.* at 58.) ·Nevertheless, given that Lauro does not dispute that she had poor performance evaluations, and the fact that culinary skills is a legitimate employment requirement in a catering crew, the Court finds that Tomkats has sufficiently alleged a legitimate business justification for terminating Lauro's employment.

Since Tomkats has set forth a legitimate business justification for denying Lauro further employment, the Court must finally consider whether this stated reason was pretextual. The court is mindful that in making this determination, it should not substitute its business judgment for that of the Defendant. *See Pascual v. Anchor Advanced Products, Inc.,* 117 F.3d 1421, 1423 (6th Cir. 1997) (court cannot sit as a "super-personnel department" in evaluating whether employment action was retaliatory) (citing *Krenik v.*

*County of Le Sueur,* 47 F.3d 953, 960 (8th Cir.1995); *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)).

A plaintiff can establish pretext through three methods:

> First, the plaintiff can show that the proffered reasons had no basis in fact. This first type of showing consists of evidence that the proffered bases for the plaintiff's adverse treatment never happened, i.e., that they were false. Second, the plaintiff can show that the reasons given by the employer were insufficient to motivate discharge. This second showing ordinarily consists of evidence that other similarly-situated individuals were more favorably treated. Third, the plaintiff can show that the defendant's proffered reason did not actually motivate the adverse action. In order to make this third type of showing, the plaintiff must introduce additional evidence of discrimination.

*Evans v. Jay Instrument and Specialty Co.,* 889 F.Supp. 302, 309–10 (S.D.Ohio 1995) (citations omitted) (citing *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1083–84 (6th Cir.1994)). In the present case, Lauro has not attempted to show that Morales' proffered reasons for denying her further employment were false, or that they were insufficient to motivate the discharge given his treatment of other employees similarly situated to Lauro. However, Lauro does appear to seek to prove that her poor work evaluations and unwillingness to attend culinary school were not the motivating reasons for her termination. The record contains several items of evidence that would contradict Morales' stated reasons terminating Lauro, namely: (1) McGraw's comments regarding Tomkat's unwillingness to hire Lauro into a crew because Long was the assigned crew leader; (2) the fact that Lauro had been given poor performance evaluations in the past, yet it was not until she complained of the sexual harassment that Morales refused to assign her to any more catering crews; and (3) that having culinary experience may not have been a legitimate job requirement for a set-up and preparation person, although Morales states that it is

better to have crew members with culinary experience in case of an emergency. (*See* Morales Dep. at 59.) The Court finds that these items of evidence are sufficient to raise a genuine question of fact as to whether Tomkats' reason for terminating Lauro are pretextual.

### B. *California Privacy Act*

Tomkats has asserted counterclaims against Lauro on the basis of common law fraud and the California Invasion of Privacy Act, Cal.Penal Code § 630 *et seq.*, but only seeks summary judgment on the Privacy Act claim. Both of these claims relate to Lauro's tape recording of conversations between herself and the Tomkats crew.

### 1. *Jurisdiction over Counterclaims*

Before reaching the merits of this claim, the Court must first address whether the California Privacy Act and fraud claims are properly before it. The counterclaims are based on state law causes of action and thus do not raise federal issues. *See* 28 U.S.C. § 1331. Furthermore, the parties are not diverse and accordingly, the Court does not have independent jurisdiction based on diversity of citizenship. *See* 28 U.S.C. § 1332. Thus, in order for the Court to exercise jurisdiction over these claims it must extend supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Section 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." However, the Court may decline to exercise jurisdiction if: " (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Tomkats argues that the Court has ancillary jurisdiction over these claims as

they are compulsory counterclaims which "arise out of the same transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." FED. R. CIV. P. 13(a); *see Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 468–69 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974) ("If a counterclaim is compulsory, the federal court will have ancillary jurisdiction over it even though ordinarily it would be a matter for a state court.").

In *Maddox v. Kentucky Finance Co., Inc.*, 736 F.2d 380 (6th Cir.1984), the Sixth Circuit affirmed that in determining whether or not a counterclaim is compulsory, a "logical relation" test must be applied. *Id.* at 382. Specifically, the court must focus on the following: (1) whether there is a "logical relationship" between the two claims," (2) whether "the issues of fact and law raised by the claim and counterclaim [are] largely the same," (3) whether "res judicata [would] bar a subsequent suit on the counterclaim if the court were not to take jurisdiction," and (4) whether "substantially the same evidence [would] support or refute both the claim and the counterclaim." *Id.* In the context of the present case, the Court notes that a strict application of this test would result in a finding that Tomkats' counterclaims are not compulsory. Although there might be a "logical relationship" between the claims and counterclaims, as Lauro's tape recordings are being submitted as proof of her sexual harassment claims, the issues of fact and law raised by Tomkats' Privacy Act and fraud claims are not similar. In order to prove its counterclaims, Tomkats will have to inquire into the circumstances under which the recordings were made, and to the reasonable expectations of those individuals who were tape recorded. These issues are not relevant to Lauro's sexual harassment claims. Further, *res judicata* would most likely not bar relitigation of the counterclaims, since they appear to address completely different issues than those raised by Lauro.[2] Finally, as the

---

2. The Court notes, however, that making the *res judicata* consequences a factor in determining

whether a counterclaim is compulsory is circuitous. One of the factors to be considered in

counterclaims relate to different issues of fact and law, the evidence presented to establish these claims will be different.

Nevertheless, the Court concludes that the Defendant's Privacy Act claims should be asserted in the present action because the Privacy Act provides that any evidence obtained in violation of the statute is inadmissible in any judicial proceeding, with the exception of proceedings brought to enforce the statute. Cal.Penal Code § 632(d). Accordingly, if Tomkats is prevented from asserting the Privacy Act claims in this litigation, it will be effectively deprived of a remedy. Moreover, this effect would be irreversible because the jury in the present action would be permitted to consider tape recordings against Tomkats which may later be deemed to be inadmissible. Without these recordings, it is entirely possible that Lauro may not be able to succeed on her sexual harassment claims. Permitting the Privacy Act claims to be asserted in the present action would also further the purposes of ancillary jurisdiction, which protects a party "whose rights might be irretrievably lost unless he [or she] could assert them in an ongoing action in a federal court." *Peacock v. Thomas,* 516 U.S. 349, 355, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) (quoting *Owen Equip. and Erection Co. v. Kroger,* 437 U.S. 365, 376, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)). Since the fraud claims present issues of fact which are factually related to those in the Privacy Act claims, the Court will exercise ancillary jurisdiction over these claims as well.

Lauro contends that the Court should not entertain Tomkats' counterclaims because they relate to conduct which is not at issue in this proceeding, and because the resolution of these claims would overshadow her harassment claims. Furthermore, she alleges that the proper standard to apply in evaluating confidential communications is an unresolved issue of California law, and accordingly, the Court should decline to exercise jurisdiction over this claim in favor of reserving this question for California courts.

While as previously discussed, it is true that the consideration of the Privacy Act and fraud claims would require the admission of evidence which would not be otherwise relevant, the Court concludes that this evidence will not overshadow Lauro's Title VII claims. From the transcripts produced to the Court, it appears that only two tape-recorded conversations are at issue, which together encompass twenty-three pages of transcript and involve four individuals. The testimony regarding the tape recorded conversations does not appear to be overwhelming, and should not be unduly lengthy. Furthermore, this Court is competent to evaluate what standard should be applied in evaluating whether a communication is confidential, and accordingly, the fact that this is an unsettled issue in California law does not require the Court to decline jurisdiction.

### 2. *Privacy Act Claims*

The California Invasion of Privacy Act provides as follows: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication ... shall be punished ...." Cal.Penal Code § 632(a). Section 637.2(a) of the Penal Code permits a civil action against any individual accused of violating this statute and prescribes damages of $5,000.00 per violation. *Friddle v. Epstein,* 16 Cal.App.4th 1649, 1658 & n. 5, 21 Cal.Rptr.2d 85 (1993). A "confidential communication" is defined as:

> [A]ny communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the commu-

---

deciding whether *res judicata* would bar litigation of claims is whether they were compulsory and thus should have been asserted in the prior action. *See Cyclops Corp. v. Fischbach and Moore, Inc.,* 71 F.R.D. 616, 621 (W.D.Pa.1976)

("since a compulsory counterclaim is an issue that should have been raised, res judicata demands that counterclaims not pleaded cannot be the subject of separate, subsequent suits.").

nication may reasonably expect that the communication may be overheard or recorded.

The determination of whether a communication is confidential turns on the court's objective analysis of a party's reasonable expectations—a party's subjective expectations are irrelevant. *O'Laskey v. Sortino,* 224 Cal. App.3d 241, 247, 273 Cal.Rptr. 674 (1990). However, it is unclear whether the term "confidentiality" should be construed to mean that there must exist "a reasonable expectation by one of the parties that no one is 'listening in' or overhearing the conversation," or more narrowly as "a reasonable expectation that the content of the communication has been entrusted privately to the listener." *Deteresa v. American Broadcasting Cos., Inc.,* 121 F.3d 460, 464 (9th Cir. 1997), *cert. denied,* —— U.S. ——, ——, 118 S.Ct. 1840, 140 L.Ed.2d 1090, —— (1998) (quoting *Frio v. Superior Court,* 203 Cal. App.3d 1480, 1488, 250 Cal.Rptr. 819 (1988)). The most recent pronouncement on the subject is the Ninth Circuit opinion in *Deteresa, supra,* where the Court reviewed case law and legislative history and determined that the later is the proper standard to apply. The Court finds the *Deteresa* reasoning to be persuasive, and will adopt it for the purposes of this case.

Accordingly, the Court must analyze the conversation tape recorded by Lauro to determine whether any of the parties had "an objectively reasonable expectation that the conversation would not be divulged to anyone else." *Deteresa,* 121 F.3d at 465. After reviewing the transcripts and the affidavits submitted by the individuals who were recorded, the Court finds that none of the individuals who were recorded had an "objectively reasonable expectation" that the subject matter of their conversations was private. The transcripts reflect that the conversations involved only daily bantering between co-workers, none of the subject-matter appears to be sensitive or to involve private matters. Furthermore, none of the participants ever asked the others to keep the conversation in confidence, nor did any of the participants volunteer to keep the conversation private. *See id.* (holding that con-

versation was not confidential in part because the party did not request that the information not be shared with anyone else, and the party recording the conversation did not volunteer to refrain from disclosing its contents). While Morales, LeClaire, and Long have all submitted affidavits which aver that the conversations were private, did not occur in a public place, and that they did not expect that the conversations were being overheard or recorded, the Court notes that as discussed previously, these individuals' subjective intentions with respect to these conversations are not relevant in deciding whether the conversations were confidential. The Court finds that objectively, these individuals could not have expected that the subject matter of these conversations would not be disclosed.

Accordingly, the Court denies the Defendant's Motion for Summary Judgment on the Privacy Act Claim. Furthermore, since it finds that the conversations which were tape recorded by Lauro were not confidential as a matter of law, the Court will *sua sponte* grant summary judgment on this counterclaim in favor of the Plaintiff.

## IV. CONCLUSION

In conclusion, the Court grants the Defendant's Motion for Summary Judgment in part and denies it in part. The Plaintiff's claims of sexual harassment which occurred prior to June 17, 1996 are hereby dismissed, although the Plaintiff may introduce evidence of discrimination that occurred prior to this date at trial which is relevant as historical background. The Defendant's Motion for Summary Judgment on the instances of sexual harassment that occurred subsequent to June 17, 1996 and on the retaliation claim is denied. Further, the Defendant's Motion for Summary Judgment on its Privacy Act counterclaim is denied, and the Court grants *sua sponte* summary judgment in favor of the Plaintiff on this claim.

An Order incorporating the findings expressed herein is entered contemporaneously.

### *ORDER*

Pending before the Court are two Motions for Summary Judgment by the Defendants. In the first Motion, the Defendant has asked

for summary judgment on the Plaintiff's claims, (Doc. No. 10), and in the second, the Defendant has asked for partial summary judgment on its cross-claims. (Doc. No. 13.) For the reasons more fully detailed in the accompanying Memorandum, the Defendant's Motion for Summary Judgment on the Plaintiff's claims is GRANTED in part and DENIED in part. The Plaintiff's claims of sexual harassment which occurred prior to June 17, 1996 are hereby DISMISSED, although the Plaintiff may introduce evidence of discrimination that occurred prior to this date at trial which is relevant as historical background. The Defendant's Motion for Summary Judgment on the instances of sexual harassment that occurred subsequent to June 17, 1996 and on the retaliation claim is DENIED. Further, the Defendant's Motion for Summary Judgment on its Privacy Act counterclaim is DENIED, and the Court GRANTS *sua sponte* summary judgment in favor of the Plaintiff on this claim.

Due to a conflict in the Court's calendar, the August 4, 1998 trial date is hereby CANCELLED and trial is RE–SET for September 22, 1998 at 9:00 a.m.

It is so ORDERED.